**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Laina Jeanne YOUNG, Defendant–
Appellant.**

No. 93–1343.

United States Court of Appeals,
Tenth Circuit.

Jan. 19, 1995.

Rehearing Denied Feb. 24, 1995.

David C. Japha, Denver, CO, for defendant-appellant.

John M. Hutchins, Asst. U.S. Atty. (Henry L. Solano, U.S. Atty., with him on the brief), Denver, CO, for plaintiff-appellee.

Before BALDOCK and EBEL, Circuit Judges, and BROWN,* District Judge.

WESLEY E. BROWN, District Judge.

This case was the indirect result of a traffic stop in Arizona. On September 6, 1989, Arizona Highway Patrolman Sandra Prichett stopped a car that had crossed the center line of the highway. The driver of vehicle could not produce a driver's license when asked to but said that her name was Laina

---

* The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

Young. The driver and a passenger, Sam Evans, produced papers showing that the car had been rented by Laina Young at the Los Angeles Airport. The officer became suspicious when she obtained a description of Laina Young from the California Division of Motor Vehicles that did not match the driver of the car. In fact, the driver's name was Natasha Renfro. When asked to produce some form of identification, the driver began looking through the trunk of the vehicle. This turn of events ultimately led to the officer's discovery of a suitcase in the trunk containing approximately seven kilograms of cocaine.

A subsequent investigation led authorities to charge eleven individuals in a second superseding indictment with various counts of drug trafficking and money laundering. Defendant-appellant Laina Young was one of the individuals charged. Ms. Young and a co-defendant, Jose Gutierrez, were the only two defendants to proceed to trial. Mr. Gutierrez' appeal is decided in a companion case, *United States v. Gutierrez*, 48 F.3d 1134 (10th Cir.1995).

The evidence at trial showed a large scale conspiracy to distribute cocaine headed by a man named Ernest Evans. In short, the evidence showed that Evans distributed large amounts of cocaine to individuals in several cities. Evans obtained payment for drugs on several occasions by means of wire transfers at Western Union offices in Los Angeles. Evans had numerous individuals, including appellant Laina Young, receive these payments for him, usually in $9,000 increments.

A jury found Ms. Young guilty on two counts of money laundering in violation of 18 U.S.C. § 1956. The jury was unable to reach a verdict on one additional count of money laundering and on a charge of conspiracy to possess with intent to distribute cocaine. Appellant was sentenced to 70 months' imprisonment. She now asserts five separate grounds for error. For the reasons set forth herein, we affirm.

*Admission of Tape Recorded Conversation*

Appellant's first argument concerns the district court's denial of her motion to suppress a tape recorded telephone conversation between Keith Rutherford and Ernest Evans, two co-defendants named in the indictment. The conversation, which took place on May 5, 1993, was recorded by Rutherford upon the advice of his attorney. During the conversation Evans asked Rutherford if he intended to plead guilty and, among other things, indicated that he was willing to testify on behalf of Rutherford. Rutherford turned the tape over to the government when he pled guilty on May 10, 1993. Ernest Evans entered a guilty plea on May 14, 1993.

Ms. Young's trial began on June 7, 1993. The government called Rutherford as a witness in its case-in-chief; he gave testimony incriminating Ms. Young. Ms. Young called Ernest Evans as a witness in her case. Evans admitted being extensively involved in drug trafficking but testified that he told Young nothing about his criminal activities. During cross-examination, counsel for the government asked Evans whether he had called Rutherford within the last six weeks to see if Rutherford was going to plead guilty and to tell Rutherford that he (Evans) was willing to testify as a favorable witness. Evans denied having done so, although he acknowledged having called Rutherford at some point. Vol. 22 at 980. After the defense rested, the government indicated that it would call Rutherford as a rebuttal witness and, for the first time, disclosed the existence of the taped conversation between Rutherford and Evans. Over the defendant's objection, the trial court determined that the tape was admissible to impeach Evans and permitted the government to introduce it during Rutherford's rebuttal testimony. Counsel for Ms. Young then cross-examined Rutherford about the tape.

■ Appellant's first argument is that the government's failure to disclose the taped conversation prior to rebuttal was a violation of her right to due process under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Brady* established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of

the prosecution." *Id.*, 373 U.S. at 87, 83 S.Ct. at 1196–97.[1] Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

▪ Appellant argues that the tape contained impeaching evidence against Rutherford. Specifically, she cites a portion of the tape where Rutherford stated that he was "a pawn," that "they're pushing me around," and that "You know, because like I, like I try to tell them, I don't really know much about anything, anyway. And they [throw a bunch of names at me and] I don't know these people." Govt.Exh. 54D, E. Appellant concedes that, unlike *Brady,* the evidence at issue in this case was actually disclosed during the trial and that she had the opportunity to cross-examine Rutherford about it. She maintains, however, that the government's failure to produce the tape before the end of the case was damaging "because there is a big tactical difference between whether the government puts on damaging evidence first, or whether the defendant can cross-examine with it first." Aplt.Br. at 19. Counsel for Ms. Young also suggests that he would have prepared differently for Mr. Evans' testimony had he known about the tape. *Id.*

▪ Notwithstanding the delayed disclosure of the tape, we conclude that appellant received a fair trial. Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3385, 87 L.Ed.2d 481 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* To the extent *Brady* applies where an allegation is made that the government's belated disclosure of material during the trial resulted in prejudice to the defense,[2] the materiality inquiry focuses on whether earlier disclosure would have created a reasonable doubt of guilt. *See United States v. Rogers,* 960 F.2d 1501, 1511 (10th Cir.1992). *Cf. United States v. Beale,* 921 F.2d 1412 (11th Cir.1991) (A *Brady* violation can occur if the prosecution delays in transmitting evidence during a trial, but only if the defendant can show prejudice, *e.g.,* the material came so late that it could not be effectively used.)

Our examination of the record convinces us that there is no reasonable probability that the result of the trial would have been different had the evidence been disclosed to the defense earlier. To begin with, Rutherford's statements on the tape are so vague that their impeachment value must be considered marginal. Nothing on the tape indicates that he was referring to Ms. Young when he said "I really don't know much about anything" and "I don't know these people." Additionally, it is clear that there was ample other evidence besides Rutherford's testimony that supported Ms. Young's money laundering convictions. Without recounting the evidence in full, it is sufficient to say that the evidence showed that on several occasions appellant went to Western Union at the behest of Ernest Evans and accepted wire transfers from various individuals in the amount of $9,000. *See* Vol. 17. A jury could easily conclude that the wire transfers were made under circumstances that would likely arouse suspicion in the average person and which suggested that Ms. Young had knowledge of their illicit nature. There was also abundant circumstantial evidence from which a jury could properly conclude that appellant was aware of Ernest Evans' drug activities at the time she engaged in these monetary transactions. For example, there was evi-

---

1. Appellant does not allege that the government acted in bad faith in this case. Aplt.Br. at 22.

2. We have stated on several occasions that *Brady* is not violated when the material requested is made available during the trial. *See e.g., Rogers,* 960 F.2d at 1510. *Cf. Beale,* infra (*Brady* may be violated by disclosure occurring at trial.) Despite our seemingly unequivocal statements on this question, we have generally proceeded to examine whether the circumstances of disclosure during a trial were such as to prejudice the defense. *See e.g., Rogers,* 960 F.2d at 1511. In this case, we need not decide whether there are some circumstances where the disclosure of impeaching evidence during trial would constitute a violation of *Brady* because we find that the evidence disclosed here was not material and the delay resulted in no prejudice to the defendant.

dence that Ernest Evans lived a lavish lifestyle during the time of the alleged drug conspiracy, having purchased a $700,000 house in California and automobiles that included a BMW, a Porche, and a Rolls Royce. Ms. Young was closely associated with Evans during this time period and also associated with several of the other admitted coconspirators. Clayton Bullard testified that when he came to Los Angeles to purchase cocaine from Ernest Evans, he was introduced to Laina Young by Evans at an apartment that contained weighing scales and other materials used in the packaging of cocaine. Vol. 18 at 140–41. Bullard also testified that on one occasion when he called on the phone and Evans was unavailable, Young provided him with the names that he should send wire transfers to. *Id.* at 143. These transfers represented payment for cocaine. *Id.* at 144. Additionally, there was testimony from Clayton Bullard and Phil Evans that Ernest Evans told them that Young was involved in distributing drugs for him. Vol. 18 at 142; Vol. 21 at 751–52.

When the abundance of evidence is combined with the fact that counsel was able to cross-examine Rutherford in rebuttal and the jury was able to hear and weigh the statements on the tape, we see no basis for concluding that the outcome of the trial could have been different if the tape had been disclosed earlier. *Cf. United States v. Rogers,* 960 F.2d 1501, 1511 (10th Cir.1992) (No violation of *Brady* found where documents were disclosed to the defense on the last day of trial). *See also United States v. Kopituk,* 690 F.2d 1289, 1340 (11th Cir.1982), *cert. denied,* 461 U.S. 928, 103 S.Ct. 2089, 2090, 77 L.Ed.2d 300 (No prejudice to appellant where he was allowed to recall a witness for additional cross-examination after disclosure of impeaching material.) Similarly, appellant's vague assertion that the late disclosure affected preparation of the defense is not sufficient.[3] "[T]he relevant standard of materiality does not focus on the trial preparation, but instead on whether earlier disclosure would have created a reasonable doubt of guilt that did not otherwise exist." *United*

*States v. George,* 778 F.2d 556, 562 (10th Cir.1985) (citing *United States v. Agurs,* 427 U.S. 97, 112 n. 20, 96 S.Ct. 2392, 2401 n. 20, 49 L.Ed.2d 342 (1976).

■ Appellant also asserts that the introduction of the tape violated her Sixth Amendment right to confront the witnesses against her. She contends that "the information held back by the government prevented counsel from exploring every aspect of Mr. Rutherford's relationship with Mr. Evans, thus denying Ms. Young a full opportunity to confront that witness.". Aplt.Br. at 21. We cannot agree that Ms. Young was denied her right to confront the witness. Prior to the disclosure of the tape, counsel had the opportunity to fully cross-examine Mr. Rutherford about the events alleged in the indictment and Rutherford's relationship with Ernest Evans. In rebuttal, counsel was able to fully explore the circumstances surrounding Rutherford's taping of his conversation with Evans. Under the circumstances of this case, we conclude that appellant was provided an opportunity for effective cross-examination of the witness.

■ Appellant's final argument concerning the tape is that the government violated the Jenck's Act, 18 U.S.C. § 3500, by failing to turn the tape over immediately after Rutherford's testimony on direct examination. In light of appellant's subsequent opportunity to cross-examine Rutherford about the statements, however, we must find that any error in this regard was harmless. *See United States v. Pope,* 574 F.2d 320, 327 (6th Cir.), *cert. denied,* 436 U.S. 929, 949, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978) (Any harm from failure of government to turn over statement after direct examination was cured by allowing defendant further cross-examination concerning the statement.)

*Speedy Trial Act*

Appellant next contends that her rights under the Speedy Trial Act were violated and that the indictment should have been dismissed. In sum, appellant contends that sev-

---

**3.** The trial judge granted Ms. Young permission to recall Ernest Evans in surrebuttal to give his explanation of the tape, Vol. Supp. 2 at 1130, but counsel apparently decided not to recall him. *Id.* at 1174.

eral periods of delay resulting from continuances granted by the district court are not excludable under the Act because the court did not make the "ends of justice" findings required by statute when it granted those continuances. *See* 18 U.S.C. § 3161(h)(8)(A); *United States v. Pasquale,* 25 F.3d 948 (10th Cir.1994) (Failure to make "ends of justice" findings at each continuance precludes an examining court from justifying the continuances retroactively under § 3161(h)(8)(A).) Although we have examined the record relating to this question in detail, we find it unnecessary to lengthen this opinion by setting forth the complex procedural history of the case. Specific dates and events will be referred to herein as necessary to explain our ruling. For the reasons set forth herein, we find no violation of the Speedy Trial Act.

The Speedy Trial Act generally requires that a criminal trial must commence within 70 days of the latest of a defendant's indictment, information, or appearance. 18 U.S.C. § 3161(c)(1). Certain periods of delay are excluded, however, in computing the time within which a trial must commence. § 3161(h). Among the delays excluded are those resulting from certain continuances described in § 3161(h)(8)(A). Additionally, delays resulting from pretrial motions are generally excluded, as are reasonable periods of delay pertaining to co-defendants joined for trial. *See id.* at subsections (1)(F), (7).

■ The speedy trial issue was raised in the district court by means of a motion filed June 3, 1993, Vol. 2, Doc. 67, and was argued to the district judge on June 7, 1993. *See* Vol. 16. Although computation of the 70 day period generally begins with a defendant's first appearance, our review of the record makes clear that the specific issue raised by Ms. Young in the district court was whether more than 70 days of non-excludable delay elapsed during the period from November 2, 1992, to the date of trial, June 7, 1993. For purposes of her motion to dismiss, the defendant *conceded below that the period prior to November 2, 1992, was excludable under the Act.*[4] On appeal, appellant's argument does not appear to be similarly limited in scope. For example, appellant complains of the trial court's failure to make any "ends of justice" findings at an April 9, 1992 conference and argues that "the speedy trial time should be counted from April 9, 1992 until the first motions were filed." Aplt.Repl.Br. at 17.[5]

We will not broaden the scope of the speedy trial inquiry at this point for two

---

**4.** The defendant noted in her motion that at the April 9, 1992, status conference the court set the trial for November 2, 1992, without making any contemporaneous findings on the record as to why the ends of justice served by this continuance outweighed the best interests of the public and the defendant in a speedy trial. Vol. 2, Doc. 67 at 6. For purposes of computing the seventy day time limit, however, the defendant assumed that the time prior to November 10, 1992, was excludable under the Act. *Id.* at 6–7. Ms. Young's motion did not attempt to calculate the time excludable due to pretrial motions but simply asserted that "assuming that the November 2, 1992 trial date was set within the allowable time, and that all motions were disposed of by the November 10, 1992 order setting the *James* hearing, the seventy day period begins to run from November 10, 1992." *Id.* This was reiterated in arguments to the court, in which counsel for Ms. Young made clear that the defendant's speedy trial argument was premised solely on the time period from November 1992 until June 7, 1993. *See e.g.,* Vol. 16 at 2 ("[T]he construction of our motion is that based upon November 10, which my understanding is that's the last motion as to Ms. Young were [sic] determined, that would be the beginning of a new counting for speedy tri-

al.") *See also id.* at 7, 22–23; *id.* at 37 ("And we are conceding that the period of excludability would end on November 2, so that the arraignment of the defendants in July '92 and the filing of the second superseding indictment July '92 has no bearing whatsoever on any excludable time.") *See also id.* at 41 ("So if the government is suggesting that the time is excluded from August to May 14, 1993, if the Court accepts that proposition, then our motion must fail.")

**5.** Appellant also states that 32 days should be subtracted from the seventy day time limit based on the period from Ms. Young's arraignment on January 6, 1992, to February 10, 1992, the date a written order was entered declaring the case complex. Aplt.Rep.Br. at 16. Aside from the fact that appellant did not make this argument below, it overlooks the fact that in a case such as this the speedy trial clock would generally begin to run from the date the last co-defendant was arraigned. Although the record before us is incomplete in this regard, it shows that defendant Gutierrez was arraigned on February 7, 1992. *See Henderson v. United States,* 476 U.S. 321, 323, 106 S.Ct. 1871, 1873, 90 L.Ed.2d 299 (1986) (The Act began to run on the date of arraignment of the last co-defendant.)

reasons. First, appellant conceded a point in the district court that she now attempts to argue on appeal—namely, whether. the time prior to November 2, 1992 counted against the speedy trial clock. As a result, the district court had no opportunity to rule on any of the numerous questions raised by addressing that time period. Second, the record before us does not provide a basis from which we can determine how much of the period from January 1992 to November 1992 was excludable delay attributable to motions or other proceedings relating to appellant's co-defendants. The record does contain a docket sheet setting forth the motions Young filed prior to November 2, 1992 (and those of defendant Gutierrez). But the record contains no documentation of the motions· filed by the nine other co-defendants. In these circumstances we will not speculate as to what time is or is not excludable prior to November 2, 1992, because even the partial record before us indicates that a large number of motions were filed by appellant's co-defendants in that period.[6] In this regard, we note that appellant bears the burden of proof of supporting the motion to dismiss. *See* § 3162(a)(2). We conclude that appellant has failed to meet her burden of showing that the speedy trial clock was running prior to November 2, 1992.

We thus turn to the same issue argued by appellant in the district court: whether more than seventy days of non-excludable delay elapsed between November 2, 1992 and June 7, 1993. In arguing this issue the parties have focused almost exclusively upon whether periods of delay resulting from the continuances granted by the district court would be

excludable under § 3161(h)(8)(A). Even if a period of delay is not excludable under that subsection, however, it may. be excludable under a different provision of the Speedy Trial Act. In this case, the record shows that the entire period from November 2, 1992 to the date of trial would be excludable as to defendant Young pursuant to § 3161(h)(1)(F) and § 3161(h)(7).

Under subsection (h)(1)(F), periods of delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion are excluded from the seventy day period. Under subsection (h)(7), a reasonable period of delay is excluded when the defendant is joined for trial with a codefendant as to whom the time for trial has not yet run and no motion for severance has been granted.

■ Prior to November 2, 1992, Lisa Carol Means, a co-defendant of Ms. Young's, filed a motion to suppress evidence. Although a hearing on the motion was initially set for November 4, 1992, Means requested and was granted a continuance of the hearing, evidently for the purpose of obtaining additional witnesses. *See* Vol. 8 at 48. The motion was then set for December 4, 1992, but that hearing was canceled and the motion remained pending until it came on for hearing on May 14, 1993. When the judge inquired at this latter hearing if Means was ready to proceed with the motion to suppress, counsel announced that Means intended to enter into a plea agreement. Vol. 13 at 1–2. As a result, Means agreed to withdraw the motion to suppress. *Id.* at 13. Under § 3161(h)(1)(F), the entire period from the

---

6. Prior to the severance of October 6, 1992, the delay caused by motions filed of any of appellant's ten co-defendants would probably be attributable to appellant as well. *See* § 3161(h)(7).

Appellant asserts in her reply brief: "While the defendant acknowledges that there may have been outstanding motions filed either by this defendant or others, the failure to· decide any of those motions in no way affected the beginning of any trial." Aplt.Repl.Br. at 16. Although the meaning of this statement is not clear, it is apparently intended to suggest that the period during which motions were pending did not result in "delay" because the motions were not the actual cause of the continuances granted by the trial court.

Assuming we have interpreted appellant's assertion correctly, we must reject it as inconsistent with § 3161(h). As we pointed out in *United States v. Tranakos,* 911 F.2d 1422, 1426 (10th Cir.1990), the exclusions in § 3161(h) are automatic, so no inquiry into the "true cause" of a delay is proper. We further noted that *Henderson v. United States,* 476 U.S. 321, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986) makes clear that the entire time from the filing of a motion through the hearing on the motion is excludable under subsection (h)(1)(F). *See Tranakos,* 911 F.2d at 1426.

filing of the motion to suppress until resolution of the motion at the hearing on May 14, 1993 is excludable as to defendant Means. *See Henderson v. United States*, 476 U.S. 321, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986). And because we find that this delay was "reasonable" within the meaning of § 3161(h)(7), the delay is excludable as to defendant Young as well.[7] *See United States v. Tranakos*, 911 F.2d 1422, 1426 (10th Cir. 1990).

The period from May 14, 1993 until the date of trial is also excludable delay. The trial court interpreted comments by counsel for Ms. Young at the May 14, 1993 hearing as a request for a "*James* hearing" (to determine the admissibility of statements by alleged co-conspirators) on behalf of Ms. Young. Such an interpretation was clearly reasonable under the circumstances. *See* Vol. 13 at 28–30 and Vol. 16 at 40–41. Consequently, the court scheduled and held a *James* hearing on May 28, 1993. This period—from the time of the request through the time of the *James* hearing itself—is excludable under § 3161(h)(1)(F). *See United States v. Bermea*, 30 F.3d 1539, 1568 (5th Cir.1994) (Defendants' *James* motions tolled the speedy trial clock.) And finally, the remaining period is excludable because of defendant Gutierrez' motion to dismiss filed on May 27, 1993 and decided the day of trial, June 7, 1993. Although in October of 1992 Ms. Young's trial had been severed from that of Mr. Gutierrez (and thus delays caused by Mr. Gutierrez would not otherwise be excludable as to Ms. Young under (h)(7)), on May 14, 1993 appellant agreed to a re-joinder of her trial with the remaining defendants, including Mr. Gutierrez. *See* Vol. 13 at 7. As a result of this joinder, the delay arising

from Mr. Gutierrez' motion of May 27, 1993 is excludable as to Ms. Young under § 3161(h)(7).

Thus, the entire period from November 2, 1992 to June 7, 1993 consists of excludable delay. Based upon the record before us we find that the district court did not err in refusing to dismiss the indictment against the defendant.

### Court's Refusal to Accept Guilty Plea

Appellant next contends that the trial court abused its discretion by refusing to accept her guilty plea. Ms. Young appeared at a hearing on March 15, 1993, to plead guilty to one count of money laundering in violation of 18 U.S.C. § 1956(a)(1). The charge in question was based on a March 21, 1989 transaction in which she allegedly received a wire transfer of $9,000 at a bank and gave the money to Ernest Evans. After questioning the defendant about her role in this transaction the judge refused to accept the plea, indicating that he did not think Ms. Young's statement constituted an admission of the offense. In particular, the judge expressed concern over whether Ms. Young was willing to admit that she had the knowledge and intent required for a violation of § 1956(a)(1). Vol. 11 at 12–14.

Section 1956(a)(1) provides in part:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

---

7. Ms. Young argued in the district court that the delay caused by defendant Means' motion was not excludable as to her because of *United States v. Theron*, 782 F.2d 1510 (10th Cir.1986). *See* Vol. 16 at 42. In *Theron* we indicated that the reasonableness of a delay depends upon all the circumstances. We have weighed all of the relevant factors here and conclude that the delay was reasonable. The delay furthered the interest in efficient use of prosecutorial and judicial resources in trying multiple defendants in a single trial. *Cf. Theron*, 782 F.2d at 1514. Secondly, although Ms. Young was detained in this case pursuant to a writ, she was also under a sentence

entered in the Eastern District of Oklahoma and would otherwise have been in custody on that sentence. Young did seek a severance from the other defendants in September of 1992. She also asserted her right to a speedy trial at least as of March 17, 1993. But Young also sought extensions of time to file motions on more than one occasion and also moved to join in the motions asserted by her co-defendants, including defendant Means, on more than one occasion. *See e.g.*, Vol. 1, Docs. 18, 22, 24. *Cf. United States v. Tranakos*, 911 F.2d 1422, 1426 (10th Cir.1990) (delay of fifteen months caused by co-defendant's motion was "reasonable" under § 3161(h)(7)).

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

... (B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be guilty of an offense. The indictment in this case alleged that the defendant's conduct violated each of the three subsections listed above, (A)(i), (B)(i), and (B)(ii), and also charged her as an aider and abettor.

Under the first paragraph of § 1956(a)(1), it must be shown that the defendant engaged in the transaction "knowing" that the property represented proceeds "from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law...." *See* § 1956(c)(1). Appellant argues that the district court erroneously concluded that Ms. Young had to admit that she knew the money in question came specifically from drug trafficking before she could be guilty of the offense.

After reviewing the transcript of the plea hearing, we find that the district court could properly conclude that the defendant failed to admit the knowledge required by the first paragraph of the statute. Although the defendant stated at one point that she "knew it was unlawful activity" and at another that "I suspected it was illegal activity," when the court inquired further she was unable or unwilling to explain the factual basis for her knowledge. Vol. 11 at 16–19. Among the responses the defendant gave to the judge's questions were statements to the effect that she was just doing Evans a favor by picking up the money (*id.* at 10), that she had no idea that the money was from drugs (*id.*), that she did not know she was doing anything illegal (*id.* at 13), and that she knew that the defendant had several businesses and thought that the money was "maybe for—I don't—I can't even say cause drugs was [farthest] from my mind. A business deal." (*Id.* at 19.) Additionally, a written statement filed by the defendant admitted only that "she *probably* knew that [the money] was from some kind of illegal activity...." (emphasis added) Vol. 2, Doc. 57. The defendant did indicate at one point that she thought that the money was from "maybe gambling, something like that ..." and that the amount of the transaction made her think it "wasn't legit." [sic] Taken as a whole, however, her alleged admission of knowledge was equivocal. To "know" a fact implies more than having a mere suspicion that it is true; it suggests that one within the mind's grasp with certitude. *See* Webster's Third New Int'l. Dictionary at 1252 (1961). Although knowledge may be shown by circumstantial evidence (and the circumstances here may have been sufficient for a jury to find knowledge), when the defendant came before the court to admit guilt she made numerous statements intimating that she did not engage in the transaction knowing that the money represented proceeds of some form of illegal activity.

In addition to the foregoing, the record shows that the defendant did not admit having the intent or knowledge required for a violation of any of the three subparagraphs of § 1956(a)(1) under which she was charged. Ms. Young specifically denied knowing anything about any transaction reporting requirements, which eliminates any contention that she admitted a violation of § 1956(a)(1)(B)(ii). Neither could anything she said be construed as an admission that she engaged in the transaction "with the intent to promote the carrying on of specified unlawful activity."[8] *See* subs. (A)(i). We note that although the plea agreement contained a stipulation that the transaction was designed to promote Ernest Evans' unlawful activity, it contained no stipulation that Ms. Young knew this fact when she engaged in the transaction. *See* Vol. 2, Doc. 56. Similarly, we see no indication in any of Ms. Young's statements that she admitted having knowledge that the transaction was designed to conceal or disguise the nature, location, source, ownership, or the control of the proceeds of specified unlawful activity. *See* sub. (B)(i). A statement filed by the defendant on

---

8. "Specified unlawful activity" is defined at § 1956(c)(7).

the date of the plea hearing asserted that "Ms. Young only collected money in this fashion for Mr. Evans and never asked him, and he did not tell her, why." Vol. 2, Doc. 57. Finally, nothing in the record indicates that the defendant admitted aiding or abetting others in the commission of the offense. Aiding or abetting generally requires a showing that a defendant willfully assisted or participated in a criminal venture. *Cf. United States v. Johnson,* 911 F.2d 1394, 1399 (10th Cir.1990). Ms. Young maintained that she did not know she was doing anything illegal and did not know why she was asked to collect money in the fashion described in the indictment.

 Federal Rule of Criminal Procedure 11 gives a trial judge discretion to refuse to accept a plea of guilty. *North Carolina v. Alford,* 400 U.S. 25, 39 n. 12, 91 S.Ct. 160, 168 n. 12, 27 L.Ed.2d 162 (1970). Along with that discretion comes a duty to ensure that a plea is voluntary before it can be accepted. Fed.R.Crim.P. 11(d). Although a defendant may in some circumstances plead guilty without admitting all the elements of the offense, *see Alford,* those circumstances are not presented here. It is clear to us that the district judge did not abuse his discretion by rejecting the plea.

*Denial of the Motion to Disqualify.*

 Appellant next contends that the district judge erred by denying her motion to disqualify him. Appellant sought disqualification based upon the judge's remarks during a scheduling conference on March 17, 1993. The conference was attended by attorneys for five of the defendants. None of the defendants were present. The discussion centered upon selection of trial dates. *See* Vol. 12. When Mr. Japha (counsel for Ms. Young) insisted upon a trial by May 25, 1993 in order to comply with speedy trial requirements, the court set the trial for May 24th and 25th. The discussion then turned to whether two days for trial was sufficient and whether any of the defendants intended to or were likely to plead guilty. *Id.* at 8. Mr. Japha commented that "We tried [to plead guilty]" and the prosecutor noted "We thought Ms. Young was going to plead, but

we're reluctant to make any speculation." *Id.* When the judge indicated he thought three days for the Young and Means trial was sufficient, the following discussion took place:

MR. JAPHA: Well, Your Honor—and I'm sorry to be the stick-in-the-mud. I'm wondering then if we could start that trial, then, on Monday, May 17, because I have a conflict in the middle of the week May 26th and 27th.

THE COURT: No, because I've got the Sarmiento crowd. No. That's the week I'm in Washington for the federal judges' association. We've got a union meeting.

MR. JAPHA: What about the week before?

COURTROOM DEPUTY: He's in trial.

THE COURT: That's when we're going to be in trial on this Sarmiento case for two weeks. That's the six weeks' case that we're going to do in two. So we're going to have to do your lady on the 24th unless she sees the light.

MR. JAPHA: I hear you. I'll just say, the difficulty I have is, on Wednesday the 26th and 27th—

THE COURT: And bear in mind this: that the obvious thing that's going to happen to Ms. Young is that she's going to get convicted, and then they're going to sprinkle her and bless her with immunity, and then she's going to get to testify. And then she's going to pull the same act on me again, and then she's going to the county jail for at least 30 if not 60 or 90 days for contempt. And we'll do that as often as necessary until she starts talking.

MR. JAPHA: Well, in all due respect, Your Honor, she has been in the county jail since January of 1992 which is—

THE COURT: Well, this is going to be in addition to anything else.

MR. JAPHA: Well, I'm not quite sure how to respond to that, Your Honor.

MR. STUCKEY: [counsel for defendant Evans] Bring the light of day to her.

THE COURT: You don't need to respond, David. All I'm telling you is that that's the preview of the coming attractions.

MR. JAPHA: I understand.

THE COURT: All right. Well, we'll start Means and Young on May 24th, and we'll finish it some way that week.

Vol. 12 at 9–10. The defendant filed a motion to disqualify the district judge under 28 U.S.C. § 455(a) based upon the judge's comments concerning the defendant's "obvious" fate. Although the district court denied the motion, appellant contends that the judge's comments show a bias against her and are such that "his impartiality might reasonably be questioned" within the meaning of § 455(a).

The Supreme Court recently addressed the disqualification statute in *Liteky v. United States,* 510 U.S. ——, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). The Court noted that although § 455(a) is a "catch-all" provision that is broader than the specific grounds for disqualification set forth in § 455(b), there is some overlap between the two sections. The Court indicated that when a ground for disqualification is addressed specifically in subsection (b), the limitations applicable to that subsection are generally contained within subsection (a)'s general standard as well. *Id.,* 510 U.S. at ——–——, 114 S.Ct. at 1155–56, 127 L.Ed.2d at 489. This interplay is relevant in a case such as this where it is alleged that the judge demonstrated a bias or prejudice against the defendant. Section 455(b)(1) specifically requires disqualification where the judge "has a personal bias or prejudice concerning a party, ..." *Liteky* makes clear that this standard is not violated by every judicial predisposition; the pejorative nature of the terms "bias" and "prejudice" connotes a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate. *Id.* at ——, 114 S.Ct. at 1155, 127 L.Ed.2d at 488. *Liteky* teaches that an opinion or disposition may be considered wrongful or inappropriate where it is undeserved, or because it rests upon knowledge that the subject ought not to possess, or because it is excessive in degree. *Id.*

As *Liteky* indicated, the so-called "extrajudicial source" doctrine is the most common basis for establishing disqualifying bias or prejudice. *Id.* at ——, 114 S.Ct. at 1155, 127 L.Ed.2d at 488. That doctrine recognizes that, while judges naturally form opinions of the parties before them based upon information properly acquired in the course of judicial proceedings, it may be inappropriate to form dispositions or opinions relying upon knowledge acquired outside of such proceedings. But an "extrajudicial source" is not the only basis for showing bias or prejudice. "A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment." *Id.* *Liteky* makes clear, however, that these latter opinions do not constitute a basis for disqualification "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at ——, 114 S.Ct. at 1157, 127 L.Ed.2d at 491. "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* Likewise insufficient are "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display." *Id.*

With these standards in mind we turn to appellant's claim that the trial judge's remarks show an inappropriate prejudice against her. As an initial matter, we see no indication that the judge expressed an opinion based upon knowledge gathered outside of the course of judicial proceedings. Fundamentally, the remarks were related to Ms. Young's change of plea hearing, which is not the type of improperly acquired knowledge addressed by § 455(b)(1). *See Liteky,* 510 U.S. at ——, 114 S.Ct. at 1155, 127 L.Ed.2d at 488 ("Also not subject to characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings.") We also conclude that the judge's comments, considered in context, do not "display a deep-seated ... antagonism that would make fair judgment impossible." The comments reflected the judge's belief that Ms. Young was likely to be convicted if she went to trial. Such an opinion of what the jury was likely to find does not show that the judge could not possibly render fair judg-

ment. Nothing in the remark indicates that the judge was unable or unwilling to carry out his responsibilities impartially. Similarly, the judge's intimation that Ms. Young had not been candid with him during the change of plea hearing provides no basis for disqualification. This opinion, acquired in the course of previous proceedings, contains no indication that the judge had such a deep-seated antagonism toward the defendant that he would abandon his judicial role. Finally, the judge predicted that if Ms. Young went to trial she would be given immunity to testify and, in an obvious reference to Ms. Young's equivocal answers at the plea hearing, indicated that if she "pull[ed] the same act on me again" he would find her in contempt and put her in jail. As appellant points out, this prediction was off-base inasmuch as immunity was apparently never contemplated for Ms. Young. But we fail to see how it shows, as appellant contends, that the district judge "sided with the government." In context, this prediction of future events must be regarded as a comment by the judge upon the strategic choices faced by Ms. Young. It does reflect some impatience or exasperation on the part of the judge concerning what he believed was Ms. Young's unwillingness to make a full admission of guilt. The setting in which it was made indicates that the judge intended to convey a message to Ms. Young that if she wanted to enter a guilty plea she would have to admit knowledge sufficient to constitute an offense under the statute. Taken in context, however, it does not show "a personal bias or prejudice" within the meaning of the statute. In sum, we conclude that the district court did not err in denying the motion to disqualify.

*Sentencing*

▪■ Appellant's final arguments relate to sentencing. First, appellant contends that the trial court erred in refusing to grant a two level decrease for acceptance of responsibility. *See* USSG § 3E1.1. We review a district court's ruling on such a matter under a "clearly erroneous" standard. *United States v. Lloyd*, 13 F.3d 1450, 1453 (10th Cir.1994). Fundamentally, appellant's argument is based on the premise that Ms. Young demonstrated acceptance of responsibility at the change of plea hearing but that the judge

mistakenly rejected her plea. As we have already noted, however, Ms. Young's statements at the plea hearing were equivocal and did not constitute an admission of all the elements of the offense. We conclude that the judge did not err in refusing to grant a decrease for acceptance of responsibility.

Appellant also argues that the judge erred by refusing to grant a decrease based on Ms. Young's role in the offense. Appellant has failed to identify any specific facts, however, that would lead us to conclude that the district court was clearly erroneous in finding that she did not play a minor role in the offense. The record supports the judge's finding.

■ Finally, appellant argues that the sentence imposed by the district court contains a mathematical error that requires a remand for resentencing. Appellant was sentenced to 70 months imprisonment (the lowest end of the guideline range) on two counts of money laundering. The sentence on these two counts was to run concurrently. At the time of sentencing, Ms. Young also had an undischarged term of 49 months remaining on a sentence arising out of the District of Oklahoma. In such a situation the guidelines direct that "the sentence for the instant case shall be imposed to run consecutively to the prior undischarged term of imprisonment to the extent necessary to achieve a reasonable incremental punishment for the instant offense." USSG § 5G1.3(c). The judge stated at the sentencing hearing that the sentence in the instant case "shall run consecutively for a term of 12 months and concurrently thereafter for the balance of the defendant's imprisonment pursuant to the judgment" in the Oklahoma case. The judgment itself states that "twelve months of this sentence is to run consecutive to the sentence imposed in the Western District of Oklahoma Case. . . ." Vol. 2, Doc. 88.

Appellant suggests that the sentence imposed reflected the judge's intention that Ms. Young serve the remainder of the Oklahoma sentence (49 months) plus only twelve months additional time on the instant sentence. Recognizing that this would only result in a total of 61 months imprisonment

(which is below the 70 month sentence in this case) appellant suggests that we should send the case back and direct the district court to grant a two point reduction either for acceptance of responsibility or for a minor role in the offense, which would result in a guideline range encompassing 61 months.

We must reject appellant's tortured construction of the sentence imposed by the district judge. The notion that the judge intended for the defendant to serve less than the 70 months he imposed is untenable. The judge's intention to impose *incremental* punishment is unmistakable from the transcript of the sentencing hearing. *See* Supp. Vol. 1 at 17. As appellant recognizes, the oral pronouncement of sentence controls over any ambiguity created by the slightly different language of the written judgment. *See United States v. Blackner,* 901 F.2d 853, 855 (10th Cir.1990).

Simply put, the 70 month sentence of imprisonment in this case *began to run twelve months after the date of sentencing,* leaving appellant to serve a total combined sentence of 82 months from July 27, 1993. Thus, beginning July 27, 1994, the sentence in this case began to run concurrently with the remainder of the Oklahoma sentence. In other words, aside from the question of any credits to which the Bureau of Prisons determines she is entitled, as of July 27, 1994, appellant had 70 months imprisonment to serve on the instant sentence.

*Conclusion*

The judgment of the district court is AFFIRMED.