**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 7, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

KENNETH TODD BURKE,

Defendant-Appellant.

No. 08-8033

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 2:07-CR-141-02-WFD)**

---

Patrick J. LeBrun, Casper, Wyoming, for Defendant-Appellant.

David A. Kubichek, Assistant United States Attorney, Casper, Wyoming (Kelly H. Rankin, United States Attorney for the District of Wyoming with him on the brief) for Plaintiff-Appellee.

---

Before **TACHA**, **O'BRIEN** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

This case involves the belated disclosure of exculpatory or impeachment evidence required by *Brady v. Maryland*, 373 U.S. 83 (1963). Although we conclude that the tardy disclosure of exculpatory or impeachment evidence can

sometimes give rise to a *Brady* violation and are greatly concerned by the government's conduct in this case, we conclude that the defendant's objection to the government's belated disclosure failed to articulate any basis for finding that he was prejudiced by the delay. As a result, we affirm the judgment of the district court.

## I. Background

Kenneth Todd Burke was convicted by a jury of conspiring with James Johnston to possess with intent to distribute, and to distribute, methamphetamine. He was also convicted of maintaining a drug house.

### A. Events Leading to Mr. Burke's Indictment

In October 2006, agents from the Wyoming Division of Criminal Investigation ("WDCI") conducted an undercover purchase of methamphetamine from Teddy Corbett. After agreeing to cooperate with the WDCI agents, Mr. Corbett advised them that his primary source of methamphetamine was James Johnston, who resided in Casper, Wyoming at a home owned by Kenneth Burke's mother. Mr. Burke and Michael Jacobs, Mr. Burke's former brother-in-law, also lived at the house along with Mr. Johnston.

In December 2006, the police fitted Mr. Corbett with a wire, and sent him to purchase methamphetamine from Mr. Johnston. Perhaps sensing a trap, Mr. Johnston refused to sell Mr. Corbett drugs. The police, undeterred, obtained a warrant for the Casper home and executed a search in February 2007, after Mr.

Burke was already in jail on unrelated charges. The police uncovered methamphetamine, digital scales, and other paraphernalia in and around the couch in the living room on which Mr. Johnston slept. They also discovered drug paraphernalia and a small amount of drugs in Mr. Jacobs' bedroom. No drugs or drug-related items were found in Mr. Burke's bedroom.

As the police continued their investigation into Mr. Johnston's drug trafficking business, they quickly decided to speak to Mr. Burke. Mr. Burke admitted to the police that Mr. Johnston both used and sold methamphetamine out of their shared residence. Mr. Burke denied any involvement in Mr. Johnston's enterprise, however, and told investigators that he no longer even used methamphetamine. Instead, he claimed that he had unsuccessfully tried to get Mr. Johnston to leave the house and was glad that the police were getting the methamphetamine out of his home. His protestations of innocence notwithstanding, Mr. Burke was eventually charged with maintaining a drug-related premises and conspiracy to possess with intent to distribute, and to distribute, methamphetamine. Although Mr. Johnston separately pled guilty pursuant to a plea agreement, Mr. Burke chose to proceed to trial.

At trial, Mr. Johnston presented a very different account of Mr. Burke's involvement. According to Mr. Johnston, both he and Mr. Burke sold methamphetamine out of the shared residence. While Mr. Johnston indicated that he and Mr. Burke sold mostly to their own customers, he noted that if either was

-3-

running short on inventory, he might acquire drugs from the other. Mr. Johnston also testified that he used methamphetamine around forty times with Mr. Burke. Finally, Mr. Johnston testified that Mr. Burke had helped him deal with Mr. Corbett after the latter attempted the controlled buy. According to Mr. Johnston, Mr. Burke took Mr. Corbett to a carwash and threatened him about wearing a wire against Johnston. Mr. Corbett later corroborated Johnston's account of his confrontation with Mr. Burke. Mr. Corbett also testified that Mr. Burke had physically assaulted him when both were incarcerated, presumably in response to Corbett's involvement in the police investigation into dealings at his home.

Other witnesses at trial testified that they had purchased methamphetamine from either Mr. Johnston or Mr. Burke at the shared residence. April Spong testified that she generally purchased methamphetamine from Mr. Burke, but would purchase drugs from Mr. Johnston when Mr. Burke was unavailable. Kim Meiwes, Wendell Bray, and Joe Wilson testified that they routinely bought methamphetamine from Mr. Johnston at the Casper home. Ms. Meiwes and Mr. Wilson both also testified that they had seen Mr. Burke at the house during visits to purchase drugs from Mr. Johnston.

The jury found Mr. Burke guilty of both charges.

### B. The Factual Basis of Mr. Burke's Appeal

Before trial, Mr. Burke filed a motion seeking the disclosure of any immunity agreements between the Government and any informants that it planned

-4-

to call to the stand. The district court ordered the release of this information, and the government acknowledged its responsibility to comply. The government failed to disclose, however, that Teddy Corbett was testifying pursuant to an "informal" plea agreement reached before trial. Under the accommodation reached between the government and Mr. Corbett, the government agreed not to charge Mr. Corbett with any federal crimes in exchange for his cooperation. *See* Aplt. Br. 17. The government's failure to divulge the immunity agreement was compounded by the fact that the prosecutor, Kenneth Marken, even initially affirmatively elicited testimony at trial that there was no such agreement. Mr. Marken asked Corbett: "Are you here pursuant to any kind of plea agreement?" Mr. Corbett responded: "No." R. V 410. The prosecutor made no attempt to correct this misstatement, even though he was the one who had negotiated the agreement with Mr. Corbett.

Later during Mr. Corbett's direct testimony, however, the existence of his plea agreement was brought to light.

MR. MARKEN: Okay. Now, you gave an interview as part of your plea agreement –

MR. CORBETT: Uh-huh.

R. V 421–22. Defense counsel immediately objected and moved that the witness be excluded and his testimony disregarded by the jury on the basis that the defense had not been informed that the witness had a plea agreement. R. V 423.

When the government acknowledged that there was, in fact, an informal understanding that Mr. Corbett would receive federal immunity for his cooperation, defense counsel responded only by arguing that the existence of the immunity agreement suggested Mr. Corbett's "strong bias." *Id.* The judge refused to strike the witness on this basis and instead directed Mr. Burke to "deal with this issue on cross-examination." *Id.*

Mr. Burke's second claim of error follows from the court's suppression of his line of questioning against Joe Wilson. Mr. Wilson testified that Mr. Burke was present at the residence on occasions when he purchased methamphetamine from Mr. Johnston. Mr. Burke attempted to impeach Mr. Wilson's testimony on cross-examination by revealing that Mr. Wilson was presently under federal indictment. *See* Aplt. Br. 26. In particular, he attempted to show that the same prosecutor now questioning him in Mr. Burke's case had previously prosecuted Mr. Wilson in a previous state matter and bore responsibility for his current federal indictment. *Id.* The government raised an objection under Fed. R. Evid. 609, claiming that the questioning constituted "[i]mproper impeachment." R. V 444. The court sustained the objection. Mr. Burke now argues that this violated his Sixth Amendment right to confront witnesses against him.

## II. The Government's Belated Disclosure of *Brady* Material

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process

-6-

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Young*, 45 F.3d 1405, 1408 (10th Cir. 1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule." *Young*, 45 F.3d at 1408 (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

In a typical case involving an alleged *Brady* violation, where the purported *Brady* material is not disclosed until after trial, a defendant can establish a violation of due process by showing "1) that the prosecution suppressed evidence; 2) that the evidence was favorable to the accused; and 3) that the evidence was material." *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995). Here, however, the impeachment evidence was disclosed during trial, in time for Mr. Burke to use the information during cross-examination.

We have never explicitly decided whether, and under what circumstances, such a belated disclosure of *Brady* material would violate due process. In *Young*, we stated that "[t]o the extent *Brady* applies where an allegation is made that the government's belated disclosure of material during the trial resulted in prejudice to the defense, the materiality inquiry focuses on whether earlier disclosure would

-7-

have created a reasonable doubt of guilt." 45 F.3d at 1408, *citing United States v. Rogers*, 960 F.2d 1501, 1511 (10th Cir. 1992); *United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991). *See also United States v. Warhop*, 732 F.2d 775, 777 (10th Cir. 1984) (due process is satisfied if *Brady* material is disclosed before it is too late for the defendant to make use of the benefits of it).

Some limitation on disclosure delay is necessary to protect the principles articulated in *Brady v. Maryland.* The government's duty to disclose material evidence favorable to the accused is rooted in the premise that the sovereign's ultimate interest in criminal prosecution is not to maximize convictions for their own sake, but to ensure that "justice shall be done." *United States v. Agurs*, 427 U.S. 97, 111 (1976). This goal entails a commitment to the principle that every defendant shall receive a fair trial. When exculpatory or impeachment evidence might make the difference between conviction and acquittal, the failure to disclose that evidence to the defense "deprive[s] the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985).

It would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial. As the Second Circuit noted in *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001), the belated disclosure of *Brady* material "tend[s] to throw existing strategies and [trial] preparation into disarray." It becomes "difficult [to] assimilate new information, however favorable, when a trial already

has been prepared on the basis of the best opportunities and choices then available." *Id. See also United States v. Devin*, 918 F.2d 280, 290 (1st Cir. 1990) (explaining that a *Brady* violation would occur if delayed disclosure altered defense strategy and timely disclosure would likely have resulted in a more effective strategy). If a defendant could never make out a *Brady* violation on the basis of the effect of delay on his trial preparation and strategy, this would create dangerous incentives for prosecutors to withhold impeachment or exculpatory information until after the defense has committed itself to a particular strategy during opening statements or until it is too late for the defense to effectively use the disclosed information. It is not hard to imagine the many circumstances in which the belated revelation of *Brady* material might meaningfully alter a defendant's choices before and during trial: how to apportion time and resources to various theories when investigating the case, whether the defendant should testify, whether to focus the jury's attention on this or that defense, and so on. To force the defendant to bear these costs without recourse would offend the notion of fair trial that underlies the *Brady* principle.

At a minimum, therefore, we adopt as a holding this court's statement in *Young* that the belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an "earlier disclosure would have created a reasonable doubt of guilt." 45 F.3d at 1408. *See also United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003) (key inquiry is "whether

earlier disclosure would have created a reasonable doubt of guilt").[1]  Where the district court concludes that the government was dilatory in its compliance with *Brady*, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.  The choice of remedy is in the sound discretion of the district court. Fed. R. Crim. P. 16(d)(2) authorizes the district court in cases of non-compliance with discovery obligations to "permit the discovery or inspection," "grant a continuance," "prohibit the party from introducing the evidence not disclosed," or "enter any other order that is just under the circumstances."  *See also United States v. Johnston*, 127 F.3d 380, 391 (5th Cir. 1997) (district court has "real latitude" to fashion appropriate remedy for alleged *Brady* errors following from delayed disclosure); *United States v. Joselyn*, 99 F.3d 1182, 1196 (1st Cir. 1996) ("The district court has broad discretion to redress discovery violations in light of their seriousness and any prejudice occasioned the defendant.").

It is true that several older cases from this circuit contain broad language suggesting that delays in disclosure cannot violate due process so long as they were made during trial.  *See, e.g.*, *United States v. Bishop*, 890 F.2d 212, 218 (10th Cir. 1989) ("*Brady* is not violated when the *Brady* material is available to

_____

[1] The Appellant has not argued that the burden should shift to the government to show the lack of prejudice where the government's delay lacks any legitimate justification, and we therefore do not consider that argument.

-10-

defendants during trial"), *quoting United States v. Behrens*, 689 F.2d 154, 158 (10th Cir. 1982), and *citing United States v. George*, 778 F.2d 556, 561 (10th Cir. 1985); *United States v. Alberico*, 604 F.2d 1315, 1319 (10th Cir. 1979).  This court explained those earlier decisions in *Young*:

> We have stated on several occasions that *Brady* is not violated when the material requested is made available during the trial. [citing cases] Despite our seemingly unequivocal statements on this question, we have generally proceeded to examine whether the circumstances of disclosure during a trial were such as to prejudice the defense. *See e.g., Rogers*, 960 F.2d at 1511. In this case, we need not decide whether there are some circumstances where the disclosure of impeaching evidence during trial would constitute a violation of Brady because we find that the evidence disclosed here was not material and the delay resulted in no prejudice to the defendant.

*Young*, 45 F.3d at 1408 n.2.  A close analysis of the decisions cited by the government confirms this explanation.  In *Bishop*, the government failed to disclose until trial that the teller in a bank robbery case had identified someone other than the defendant in a photographic line-up.  Although the defense made a "tactical decision" not to recall the teller herself, the court noted that the defense elicited the exculpatory information from another witness, making "[t]he jury [] fully aware of the teller's failure to identify the defendant as the robber."  890 F.2d at 218–19.  The court concluded: "to the extent that a materiality inquiry under *Agurs* is feasible in a situation where defendant was in receipt of *Brady* materials during trial, we do not believe that earlier disclosure of the information would have given rise to a reasonable doubt that did not otherwise exist. Therefore, we affirm the district court's denial of defendant's motion for a new

trial." *Id.* We interpret this as at least leaving open the question of whether the defendant is entitled to relief for belated *Brady* disclosures where prejudice is established. To similar effect, see *Behrens*, 689 F.2d at 158 (rejecting claim that belated *Brady* disclosure violated due process on the ground that "defendants have not demonstrated that the delayed disclosure of evidence deprived them of a fair trial"); *George*, 778 F.2d at 561 (rejecting claim that belated Brady disclosure violated due process where "[t]he defendant-appellant had the information in sufficient time to cross-examine each government witness, use it in the presentation of his own case, introduce expert testimony concerning the purpose and use of the nunchaku and effectively weave this evidence into his closing statement in support of reasonable doubt."); *Rogers*, 960 F.2d at 1511 ("The fact that the documents were received on the last day of the trial does not, in itself, indicate that he did not receive a fair trial.").[2]

The majority of our sister circuits have held that while the untimely disclosure of *Brady* material does not constitute a constitutional violation in itself, it may violate due process if the defendant can show he was prejudiced by the delay. *See Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008) ("when the claim is untimely disclosure of *Brady* material, we have looked 'to whether

---

[2] We also note that each of these cases arose in the context of an argument on appeal that the delay in disclosure necessitated reversal and retrial—not, as in this case, a claim that the trial court erroneously held that there had been no prejudice from the delay and thus abused its discretion in its choice of remedy.

the defendant was prejudiced by the tardy disclosure'") (quoting *United States v. Williams*, 132 F.3d 1055, 1060 (5th Cir. 1998)); *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992) ("Delay [in disclosure] only violates *Brady* when the delay itself causes prejudice."); *United States v. Fallon*, 348 F.3d 248, 252 (7th Cir. 2003); *Leka v. Portuondo*, 257 F.3d 89, 101–04 (2d Cir. 2001); *United States v. Devin*, 918 F.2d 280, 290 (1st Cir. 1990). *See also United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008) ("A mid-trial disclosure violates *Brady* only if it comes too late for the defense to make use of it."); *United States v. Woodley*, 9 F.3d 774, 777 (9th Cir. 1993) (disclosure of *Brady* material "must be made when it is still of substantial value to the accused"); *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) ("No denial of due process occurs if *Brady* material is disclosed to appellees in time for its effective use at trial.").

As these decisions recognize, not every delay in disclosure of *Brady* material is necessarily prejudicial to the defense. *See United States v. Warren*, 454 F.3d 752, 760 (7th Cir. 2006) ("Late disclosure does not itself constitute a *Brady* violation."). As the Eleventh Circuit said in *United States v. Kubiak*, 704 F.2d 1545, 1550 (11th Cir. 1983), the focus of due process violation is "not upon the fact of nondisclosure, but upon the impact of nondisclosure on the jury's verdict." To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial. That was the problem here. Although Mr. Burke alleged a *Brady*

-13-

violation, he failed to present the trial court with any credible reason why the delayed disclosure of Mr. Corbett's plea agreement had resulted in prejudice requiring the remedy he sought—the exclusion of all testimony by the witness about whom impeachment evidence was withheld. When making his motion, Mr. Burke argued only that the plea agreement suggested that Mr. Corbett's testimony was the product of "strong bias." R. V 423. But the district court reasonably concluded that the issue of bias could be dealt with on cross-examination. *See id.*; *cf. United States v. Kuehne*, 547 F.3d 667, 698 (6th Cir. 2008) (no *Brady* violation where disclosure of impeachment evidence occurred in time to impeach witness on the stand). And indeed, on cross-examination, Mr. Burke questioned Mr. Corbett in detail about his plea agreement, exposing to the jury that Mr. Corbett was promised that "there would be no federal charges filed against [him] as long as [he] cooperated fully . . . ." R. V 430–31. As a result, Mr. Burke was able to apprise the jury of his theory that Mr. Corbett's testimony was biased by his self-interest in cooperating with the government. The district court, therefore, did not err in concluding that the opportunity to cross-examine Mr. Corbett would allow Mr. Burke to fully develop his theory of bias.

On appeal, however, Mr. Burke argues that the delayed disclosure of Mr. Corbett's immunity agreement caused a different kind of prejudice—disrupting and altering his trial strategy. Mr. Burke now suggests that had he been aware in advance "that Mr. Corbett was subject to extremely persuasive bias cross-

-14-

examination," Aplt. Br. 22–23 his strategy during opening statements would have been different.  Instead of conceding that Mr. Burke had met with Mr. Corbett after the controlled buy and had physically assaulted him at the jail, while offering a more innocuous explanation for both events, Mr. Burke argues that he would have "held the Government to its burden on this issue and insisted that the Government rely upon its impeachable witness Mr. Corbett."  Aplt. Br. 23.

We have no need to determine whether this claim of prejudice is sufficient. As with other legal issues that arise in the midst of trial, it is the obligation of the parties to present their arguments to the district court, to enable the court to fashion a remedy if the circumstances warrant it.  In this case, Mr. Burke's motion before the district court did not encompass any claim that the government's delayed disclosure had altered his trial strategy.  He relied solely on the fact that the belatedly-received information revealed a source of bias on the part of the witness, which the district court correctly ruled could be dealt with by cross-examination.  As we explained in *United States v. Zubia-Torres*, 550 F.3d 1202, 1206 (10th Cir. 2008), when a defendant pursues a particular theory or objection, but fails to raise another closely related argument, he has forfeited the argument and we review only for plain error.  *See also United States v. Blandin*, 784 F.2d 1048, 1051 (10th Cir. 1986) (reviewing delayed disclosure of exhibits for plain error after failure to timely object).  Because the district court was never apprised of the claim of prejudice now raised, Mr. Burke forfeited this basis for

arguing that the government's delayed disclosure of Mr. Corbett's immunity materially prejudiced his defense.

Although the argument was not timely raised before the district court, we nonetheless review for plain error. When reviewing an issue for plain error, we will reverse the judgment below only if there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Duffield v. Jackson*, 545 F.3d 1234, 1238 (10th Cir. 2008). It is hardly plain from the record that had Mr. Burke executed his alternative strategy—disavowing Mr. Corbett's claims that Mr. Burke physically assaulted him at the jail and warned him about informing against Mr. Johnston—this would have materially affected the outcome of trial. Perhaps so, but both Mr. Corbett and Mr. Johnson offered similar testimony that the alleged events had occurred, enhancing their individual credibility. Moreover, the prosecution likely had physical records that could have been introduced to confirm Mr. Corbett and Mr. Burke's confrontation at the jail. Finally, the force of additional testimony from Mr. Johnson and Ms. Spong incriminating Mr. Burke would have been unaffected by any change in strategy. Mr. Burke's argument is plausible, but falls short of plainly correct.

### III. The Suppression of Mr. Burke's Impeachment of Mr. Wilson

We next review Mr. Burke's claim that he was unconstitutionally deprived of his Sixth Amendment right to confront those witnesses testifying against him.

-16-

We conclude that even assuming that the court improperly curtailed Mr. Burke's right to confront Joe Wilson, any error was harmless beyond a reasonable doubt.

The reversal of a conviction is not warranted merely because a litigant can show the existence of a Confrontation Clause error. If the error is harmless beyond a reasonable doubt, Mr. Burke's conviction need not be overturned. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). When determining whether a Confrontation Clause error is harmless, we have looked to (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of the actual cross-examination; and (5) the overall strength of the State's case. *Jones v. Gibson*, 206 F.3d 946, 957 (10th Cir. 2000).

In this case, we are confident that any improper suppression of Mr. Burke's cross-examination of Mr. Wilson was harmless. Most importantly, in the scheme of the government's overall case against Mr. Burke, Mr. Wilson's testimony was of relatively minimal importance, and mostly cumulative. Mr. Wilson did not testify that Mr. Burke sold drugs to him—only that Mr. Burke was present at the shared residence while Mr. Johnston was selling drugs. Numerous witnesses testified to the same or similar facts. Kim Meiwes, for instance, testified that she saw Mr. Burke at the house when she purchased drugs from Mr. Johnston. Aple. Br. 14. Similarly, April Sprong testified that she separately purchased drugs from

-17-

both Johnston and Burke at the shared residence.  Finally, Mr. Johnston—Mr. Burke's alleged conspirator—also testified in accord with the state's general theory.

The extent of the cross-examination actually conducted also somewhat diminishes the risk of prejudice from any premature suppression of Mr. Burke's line of questioning.  For instance, Mr. Burke was able to elicit explicit testimony that Mr. Wilson had never purchased drugs from him.  R. V 444–45.  Mr. Burke also impeached Mr. Wilson by presenting evidence of his extensive criminal history, including that he had previously been convicted of providing false information to a court.  R. V 442; *see Jones*, 206 F.3d at 958 (finding relevant to the harmlessness inquiry whether the witness in question was impeached through other means).

Finally, the state's case was not so weak that further cross-examination of Mr. Wilson reasonably could have been expected to affect the jury's deliberations.  Multiple witnesses had testified that drugs were sold at Mr. Burke's home and that Mr. Burke himself engaged in the sale of drugs.  In addition, Mr. Johnston testified that he and Mr. Burke obtained drugs from each other on occasion to serve their customers.  R. V 342.  In the context of this evidence, even the total absence of Mr. Wilson's testimony would have done little to diminish the government's case.  We therefore conclude that any alleged Confrontation Clause error was harmless beyond a reasonable doubt.

## IV. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.