**UNITED STATES of America,**
**Plaintiff,**

v.

**Arthur BURTON, a/k/a "Guero," and**
**Kevin Folse, a/k/a "Criminal,"**
**Defendants.**

**No. CR 14–2354 JB.**

United States District Court,
D. New Mexico.

Filed Jan. 26, 2015.

Damon P. Martinez, United States Attorney, Joel R. Meyers, Samuel A. Hurtado, Assistant United States Attorneys, United States Attorney's Office, Albuquerque, NM, for the Plaintiff.

Ryan J. Villa, Albuquerque, NM, for the Defendant.

### UNSEALED MEMORANDUM OPINION AND ORDER [1]

JAMES O. BROWNING, District Judge.

**THIS MATTER** comes before the Court on the Sealed Motion to Compel Production of Discovery, filed November 9, 2014 (Doc. 28)("Motion"). The Court held a hearing on December 5, 2014. The primary issue is whether the Court should compel Plaintiff United States of America to disclose four categories of information: (i) all records related to the investigations that the Federal Bureau of Investigation ("FBI") or the New Mexico State Police ("NMSP") conducted of the shooting that occurred on June 4, 2013; (ii) all records relating to the prior drug transactions that

Defendant Kevin Folse conducted as a confidential informant ("CI") for the FBI; (iii) all audio recordings, records, or reports regarding James Ronquillo's post-arrest interview; (iv) numerous FBI policies governing CIs and targets; and (v) all recordings or documentation of FBI Special Agent Kalon Fancher's conversations with Folse and co-Defendant Arthur Burton before June 4, 2013. After securing a number of stipulations and concessions from the United States, the Court will deny the Motion.

First, the Court will deny Folse's request for all records related to the investigations that the FBI and the NMSP conducted of the shooting that occurred on June 4, 2014. The United States has stipulated that: (i) neither Burton nor Ronquillo knew that they were selling to law enforcement officers on June 4, 2013; and (ii) that Fancher has never been criticized, reprimanded, or formally punished for the events that occurred on June 4, 2013. There is no indication that the records that Folse seeks contain any information that is discoverable under rule 16 of the Federal Rules of Criminal Procedure, beyond the information to which the United States has already stipulated. Second, the Court will deny Folse's request for all records relating to the drug transactions that he conducted before June 4, 2013, as a CI for the FBI. The United States has promised that it will disclose all records relating to the drug transaction that Folse conducted on February 4, 2013, because the United States intends to offer evidence

---

1. In its Sealed Memorandum Opinion and Order, filed Jan. 8, 2014 (Doc. 63)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court published a public version of the Sealed MOO. See Sealed MOO at 1 n. 1. The Court gave the parties fourteen

calendar days to provide notice of any proposed redactions. See Sealed MOO at 1 n. 1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in its unsealed form.

and testimony about that transaction at trial. Moreover, the United States has stipulated that: (i) Fancher did not suspect before June 4, 2013, that Folse had either used fake drugs or kept part of the proceeds from the drug transactions that he had set up for the FBI; (ii) Fancher never had a conversation with Folse in which he told Folse not to use fake drugs; (iii) the FBI's protocol with CIs is to count any money that agents give to CIs before giving it to them, and to search CIs before and after the transactions that they set up; and (iv) Fancher followed that protocol for every drug transaction that Folse executed for the FBI. There is no indication that the FBI reports that Folse seeks contain any information that is discoverable under rule 16 beyond that to which the United States has already stipulated. Third, the Court will deny Folse's request for all audio recordings, records, or reports regarding Ronquillo's custodial interview. The United States has said that there is no recording of Ronquillo's interview, and that the only report in its possession regarding that interview is the 302[2]—which Folse has already received. Fourth, the Court will deny Folse's request for numerous FBI policies governing CIs and targets. Because the United States has stipulated that the FBI policies that Folse possesses from 2005 are substantially similar to the FBI's current policies, and because the United States will not deny or dispute that they are still operative, the policies that Folse seeks are immaterial to his defense and are, therefore, not discoverable under rule 16. Fifth, the Court will deny Folse's request for all audio recordings and documentation of all conversations that Fancher had with Folse and Burton before June 4, 2013. The United States has represented that there are no

recordings or documentation for Fancher's conversations with Burton, and the Court cannot order the United States to disclose information that does not exist. Regarding Fancher's conversations with Folse, the United States has said that it would allow Folse to review the following information in Folse's CI file: (i) administrative information—such as authorized illegal activity information and payments that Folse received from and made for the FBI; (ii) everything in Folse's CI file related to the Burton investigation; and (iii) preliminary documents to ensure that Fancher was complying with the FBI's policies for CIs—such as when he first decided to use Folse as a CI, his evaluation of the risk of using Folse as a CI, contacting the state prison for permission to use Folse as a CI, and similar documents. Aside from this information, Folse has not explained to the Court how any additional information regarding Folse's conversations with Fancher is discoverable under rule 16.

### *FACTUAL BACKGROUND*

The United States alleges that, between on or about May 16, 2013, and on or about June 4, 2013, Folse and Burton engaged in a scheme to steal $7,000.00 from the FBI by selling fake cocaine base (*i.e.,* "crack cocaine") to an undercover law enforcement officer. *See* Indictment at 2, filed July 10, 2014 (Doc. 1)("Indictment"). Folse was incarcerated in the Central New Mexico Correctional Facility in Los Lunas, New Mexico ("CNMCF"), throughout the conduct that the Indictment alleges. *See* Indictment at 2–4. On or about May 16, 2013, Folse made a telephone call from CNMCF to Burton. *See* Indictment at 2. During this call, Folse instructed Burton to take Folse's money to "Lorraine." In-

---

**2.** A "302," otherwise known as an "FD–302," is a form that FBI agents use "to report or summarize the interviews that they conduct."

*List of FBI Forms,* Wikipedia.org, http://en.wikipedia.org/wiki/List_of_FBI_forms# FD–302 (last visited Jan. 6, 2015).

dictment at 2. Burton agreed. *See* Indictment at 2. Folse and Burton also discussed their scheme to sell fake drugs. *See* Indictment at 2. Folse expressed confidence that their scheme would go as planned. *See* Indictment at 2.

Approximately eight days later, on May 24, 2013, a male subject identified only as "Spaz"—from CNMCF—called Burton. *See* Indictment at 3. During the call, Spaz told Burton that Folse had made arrangements to execute their scheme. *See* Indictment at 3. On May 28, 2013, Folse called Burton, explained his scheme to make $7,000.00, and reiterated that Burton should take Folse's share of the scheme's proceeds to Lorraine. *See* Indictment at 3. Burton agreed. *See id.* at 3.

On or about May 29, 2013, Spaz—from CNMCF—called Burton and told him that Folse would call him at 7:00 [3] the following day. *See* Indictment at 3. On May 30, 2013, Folse called Burton and again told him to take Folse's share of the money to Lorraine. *See* Indictment at 3. Folse called Burton a second time that day and told Burton to call "Big Homie"—*i.e.,* Special Agent Fancher. Indictment at 3–4. Burton agreed. *See id.* at 4. On or about June 1, 2013, Folse called Burton to explain that he wanted Burton to deliver his money to "Julio" instead of to Lorraine. Indictment at 4. Burton agreed. *See id.* at 4. Folse also said that he planned to call Big Homie. *See* Indictment at 4. On or about June 3, 2013, Folse called Burton and told him to call Big Homie. *See* Indictment at 4. Burton agreed. *See id.* at 4. Folse again instructed Burton to give his money to Julio. *See* Indictment at 4–5. Folse also told Burton that nobody else knew about their scheme and that Burton could trust him. *See* Indictment at 5.

During a telephone call between Folse and Burton on June 4, 2014, Burton expressed concern to Folse about their scheme and said that he did not trust anyone. *See* Indictment at 5. Folse assured Burton that nobody involved in the scheme was a law enforcement officer. *See* Indictment at 5. Folse also reminded Burton to take Folse's money to Julio. *See* Indictment at 5. That same day, Burton recruited Ronquillo to deliver the fake drugs. *See* Motion at 3; United States' (Sealed) Response in Opposition to Defendant's Appeal of Detention Order ¶ 8, at 3, filed November 6, 2014 (Doc. 26)("Opposition"); United States' (Sealed) Notice of Intent to Offer Evidence Pursuant to Rule 404(b) and Request for Pretrial Ruling on the Government's Request to Admit Evidence at 5, filed December 13, 2014 (Doc. 50)("404(b) Motion"). Ronquillo delivered approximately 207 grams of fake crack cocaine to an undercover police officer— who was acting at the direction of the FBI—in exchange for $7,000.00. *See* Indictment at 5. The FBI agents on the scene did not arrest Ronquillo when the transaction occurred. *See* Motion at 3. The agents quickly learned, however, that Ronquillo had given the undercover officer fake drugs. *See* Opposition ¶ 9, at 3; 404(b) Motion at 5.

FBI Special Agent Lennie Johnson and FBI Task Force Officer Eugene Ethridge followed Ronquillo and Burton in an FBI surveillance vehicle from the site of the transaction. *See* Opposition ¶ 9, at 3; 404(b) Motion at 5. Although Burton managed to elude the agents, they continued to follow Ronquillo's car. *See* Opposition ¶ 9, at 3; 404(b) Motion at 5. Ronquillo noticed the FBI surveillance vehicle following him. *See* Opposition ¶ 9, at 3; 404(b) Motion at 5. Ronquillo believed that they were drug dealers trying to kill him for ripping them

---

**3.** The Indictment does not indicate whether Spaz was referring to 7:00 p.m. or 7:00 a.m.

off, so he panicked and made a frantic 911 call for police assistance. *See* Motion at 4; Opposition ¶ 9, at 3; 404(b) Motion at 5. Ronquillo then saw the surveillance vehicle blocking the street in front of him. *See* Opposition ¶ 10, at 3. He tried to escape by speeding towards the vehicle while Johnson exited the passenger's side and shot at Ronquillo's car to try to stop him from colliding with them. *See* Motion at 4; Opposition ¶ 10, at 3; 404(b) Motion at 5. Ronquillo's car struck the driver's side of the vehicle, trapping Ethridge inside. *See* Opposition ¶ 10, at 3–4; 404(b) Motion at 6. Although Ronquillo's car was damaged, he continued driving past the vehicle. *See* Opposition ¶ 10, at 4; 404(b) Motion at 6. An Albuquerque Police Department marked patrol car saw Ronquillo driving erratically, conducted a traffic stop, and arrested Ronquillo. *See* Opposition ¶ 10, at 4; 404(b) Motion at 6. Ronquillo was charged with assault on a federal law enforcement officer, but, at his preliminary hearing, United States Magistrate Judge Lorenzo F. Garcia found that there was no probable cause for the charge, because Ronquillo did not know that the agents who pursued him were law enforcement. *See* Motion at 4, 8; Criminal Complaint at 1, filed June 5, 2013 (Doc. 2), *United States v. Ronquillo,* No. 13–MJ–1946 (Garcia, M.J.); Preliminary Examination/Detention Hearing at 42:1–13, filed June 10, 2013 (Doc. 10), *United States v. Ronquillo,* No. 13–MJ–1946 (Garcia, M.J.). Burton managed to escape with the $7,000.00, and is still at large. *See* Motion at 4; 404(b) Motion at 5.

## PROCEDURAL BACKGROUND

The Grand Jury filed a Sealed Indictment on July 10, 2014, which charged Folse and Burton with: (i) conspiracy, in violation of 18 U.S.C. § 371; (ii) wire fraud, in violation of 18 U.S.C. § 1343; and (iii) theft of government property, in viola-

tion of 18 U.S.C. § 641. *See* Indictment at 1.

### 1. *The Motion.*

Folse filed the Motion on November 9, 2014. *See* Motion at 1. In the Motion, Folse asks the Court to compel the United States to disclose four categories of information. *See* Motion at 6–9. First, Folse moves to compel the production of all records related to the investigations that the FBI and the NMSP conducted of the shooting that occurred on June 4, 2013. *See* Motion at 6–7. Folse argues that, because of the June 4, 2013, incident, the FBI had to find someone to hold responsible and chose him as their scapegoat. *See* Motion at 5–6. Folse points out that an FBI evidence response team and an NMSP crime scene team investigated the scene of the shooting. *See* Motion at 6. Folse contends that those agencies' reports and conclusions regarding the shooting are material to his defense, because they will demonstrate: (i) the FBI's motive for accusing Folse of stealing government money; and (ii) that "it was the FBI's own blunderings that led to Mr. Burton, who was acting alone, making off with $7,000," rather than Folse's actions. Motion at 7.

Second, Folse asks the Court to compel the United States to produce all records relating to the drug transactions that he conducted as a CI before June 4, 2013. *See* Motion at 7–8. Folse explains that Fancher used him as a CI before the acts that form the basis of the Indictment allegedly occurred. *See* Motion at 7. Folse argues that the crux of the United State's case is that he and Burton agreed to sell crack cocaine to the FBI instead of real cocaine to trick the FBI into giving them $7,000.00 *See* Motion at 7. Folse points out, however, that, if he believed during the previous drug transactions that he was

doing his job as a CI even when the drugs were fake, he similarly could have believed that he was doing his job when he had having Burton sell fake crack cocaine on June 4, 2013. *See* Motion at 7. Folse argues that these prior transactions could also show that Fancher knew that Folse had previously set up fake drug transactions and implicitly authorized him to conduct similar transactions by not accusing him of any wrongdoing until after the June 4, 2013, transaction. *See* Motion at 8.

Third, Folse moves to compel the production of any audio recordings, records, or reports regarding Ronquillo's post-arrest interview. *See* Motion at 8. Folse explains that Ronquillo played an integral role in the June 4, 2013, shooting. *See* Motion at 8. Folse alleges that Burton recruited Ronquillo to deliver fake crack cocaine to an undercover law enforcement officer in exchange for $7,000.00 on June 3, 2013. *See* Motion at 8. Folse asserts that, although Ronquillo was accused of assaulting a law enforcement officer for the June 4, 2013, incident, he was later exonerated, because he did not know that the agents were law enforcement officers. *See* Motion at 8. Folse argues that a recording or report of Ronquillo's interview would reveal two pieces of information that are material to his defense: (i) whether Ronquillo believed the FBI agents were drug dealers and not law enforcement officers; and (ii) whether Folse knew that Burton intended to sell fake rather than real crack cocaine during the June 4, 2013, transaction. *See* Motion at 8.

Fourth, Folse asks the Court to order the United States to numerous FBI policies governing CIs and targets. *See* Motion at 9. Folse points out that, if FBI policy dictates that CIs' calls must be monitored and recorded, and if a CI is told about such monitoring and recording, such a policy would make it less likely that Folse would conspire to steal government money with Burton, knowing that the agency he is seeking to deceive is monitoring his calls. *See* Motion at 9. Moreover, Folse asserts that, if FBI policy dictates that CIs' calls must be monitored and recorded, but the FBI failed to record Folse's calls, such an oversight would undermine the United States' case and further Folse's theory that Fancher "is pointing the finger at Mr. Folse when in fact he is at fault." Motion at 10. Folse also argues that FBI policy may explicitly state that Folse was permitted to sell fake drugs. *See* Motion at 9. Folse says that, similarly, if there is no FBI policy prohibiting a CI from selling fake drugs, he cannot be expected to know that the FBI prohibited him from setting up such a transaction. *See* Motion at 10.

### 2. *The Response.*

The United States responded to the Motion on December 1, 2014. *See* United States' Sealed Response in Opposition to Defendant's Sealed Motion to Compel Production of Discovery (Doc. 28), filed December 12, 2014 (Doc. 45)("Response"). In the Response, the United States addresses each category of information that Folse asks the Court to compel. *See* Response at 6–9. First, the United States argues that Folse is not entitled to any records of the investigations that the FBI and the NMSP conducted of the shooting that occurred on June 4, 2013. *See* Response at 5–6. The United States points out that Folse and Burton are charged only with offenses arising from the scheme to sell fake drugs to the FBI. *See* Response at 6. In the United States' view, because the shooting occurred after the fake drug transaction, and because Burton and Folse were not charged with any offenses related to the shooting, any investigation into the shooting is irrelevant. *See* Response at 6. The United States asserts

that, to the extent that Folse seeks evidence favorable to him on the issue of guilt or punishment, the United States is aware of its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and does not currently possess any such evidence. *See* Response at 6.

Second, the United States contends that any records relating to the drug transactions that Folse conducted as a CI before June 4, 2013, are immaterial under rule 16 and are, therefore, not discoverable. *See* Response at 7. The United States asserts that delving into Folse's prior drug transactions as a CI would confuse the jury and "create a trial within a trial." Response at 7. The United States argues that the danger of unfair prejudice "stemming from another set of facts and circumstances" outweighs any probative value of Folse's prior drug transactions. Response at 7.

Third, the United States argues that the recordings and records of Ronquillo's post-arrest interview are not discoverable under rule 16. *See* Response at 7. The United States points out that it has already disclosed investigative reports concerning Ronquillo's post-arrest interview to Folse. *See* Response at 7. The United States asserts that, while Ronquillo interacted with Burton as part of Burton and Folse's scheme to sell fake drugs, there is no evidence to suggest that Ronquillo knew Folse or vice versa. *See* Response at 8. The United States contends that, accordingly, there is no indication that the recording would play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting in impeachment or rebuttal. *See* Response at 8.

Fourth, the United States asserts that Folse is not entitled to the FBI's policies governing CIs. *See* Response at 8. The United States contends that these policies

have nothing to do with the criminal offenses for which Folse is charged. *See* Response at 8. In the United States' view, Folse provides only a conclusory, unsubstantiated belief that Fancher violated FBI policy and that this violation motivated Fancher to wrongly accuse Folse of the charged conduct. *See* Response at 8. The United States argues that this assertion is an insufficient basis upon which to compel the United States to produce FBI policies. *See* Response at 8 (citing *United States v. Mandel,* 914 F.2d 1215, 1219 (9th Cir.1990) ("Neither a general description of the information sought *nor conclusory allegations of materiality suffice;* a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense.")(emphasis in Response but not in *United States v. Mandel* )).

### 3. *The December 5, 2014, Hearing.*

The Court held a hearing on December 5, 2014. *See* Transcript of Hearing (taken December 5, 2014)("Tr."). At the hearing, Folse first addressed his request for all records related to the investigations that the FBI and the NMSP conducted of the shooting that occurred on June 4, 2013. *See* Tr. at 4:9–15:6 (Court, Villa). Folse explained that these records are discoverable, because they may indicate that neither Ronquillo nor Burton knew that they were selling to law enforcement officers on June 4, 2013. *See* Tr. at 4:9–15 (Villa). The Court asked whether the United States would stipulate that neither Ronquillo nor Burton knew that they were selling to law enforcement officers on June 4, 2013. *See* Tr. at 5:4–6 (Court); *id.* at 5:11–15 (Court, Villa). The United States said that it would so stipulate. *See* Tr. at 5:7–8 (Hurtado); *id.* at 5:16 (Hurtado). Folse argued that the investigation records may also show Fancher's motive to blame

Folse for the events of June 4, 2013. *See* Tr. at 4:9–15 (Villa); *id.* at 5:19–24 (Villa). Folse stated that, if Fancher's superiors punished or criticized him for the events of June 4, 2013, that would make it more likely that he wrongfully investigated and blamed Folse for those events. *See* Tr. at 8:17–25 (Villa).

The Court asked the United States whether the FBI's and the NMSP's reports detailing those agencies' investigations into what occurred on June 4, 2013, contain material that the United States must produce under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)—*e.g.*, any evidence that Fancher was punished, criticized, or violated any FBI guidelines in setting up and executing the drug transaction with Folse. *See* Tr. at 10:4–6 (Court); *id.* at 10:12–14 (Court); *id.* at 10:18–23 (Court); *id.* at 11:6–9 (Court). The United States said that it has spoken with Fancher and, as far as the United States knows, those reports do not contain any material that must be disclosed under *Giglio v. United States*. *See* Tr. at 10:15–17 (Hurtado). The United States maintained that there were no disciplinary measures taken or adverse findings made against Fancher, Johnson, or Ethridge regarding the events of June 4, 2013. *See* Tr. at 11:1–5 (Hurtado); *id.* at 11:19–25 (Hurtado). The Court told the United States to take a second look—and to be sure to look personally—at the reports from the investigations to ensure that they do not contain any information indicating that Fancher was punished or criticized in any way for the events of June 4, 2013. *See* Tr. at 12:2–9 (Court). The United States agreed to do so. *See* Tr. at 12:10 (Hurtado). The Court said that, other than making those cautionary remarks to the United States, it was not inclined to order the United States to produce any reports regarding the June 4, 2014, shooting. *See* Tr. at 15:4–6 (Court).

The United States reiterated the argument from its Response that any mention of the June 4, 2013, shooting would confuse the jury in violation of rule 403 of the Federal Rules of Evidence. *See* Tr. at 12:11–13–7 (Hurtado). The Court said that the shooting seems to be a double-edged sword for both parties. *See* Tr. at 13:10–11 (Court). The Court asserted that the United States should not be so nervous about it coming into evidence, because it demonstrates that Folse runs with some pretty rough people that are willing to run into cars and do all sorts of things. *See* Tr. at 13:11–16 (Court). The Court stated that it did not understand why Folse would want to offer evidence that paints such a negative picture of him. *See* Tr. at 13:19–24 (Court). The Court observed, however, that that it would not be difficult for the jury to consider evidence of the shooting and that he has to allow Folse to offer any impeachment evidence. *See* Tr. at 13:19–20 (Court). The Court said that, consequently, it would likely allow Folse to offer evidence and testimony about the June 4, 2013, shooting at trial. *See* Tr. at 14:1–3 (Court).

Second, Folse turned to his request for all records relating to the seven drug transactions with Burton that Folse conducted as a CI for the FBI before June 4, 2013. *See* Tr. at 15:9–17 (Villa). The Court asked why the United States would have seven transactions with Burton instead of one or two. *See* Tr. at 17:5–7 (Court). Folse responded that Burton was a clever individual and another individual, rather than Burton, often appeared unexpectedly at the drug transactions. *See* Tr. at 17:8–13 (Villa). Folse argues that, if the FBI received the drugs from these transactions, tested them, and discovered that they were fake, that conduct goes to whether Folse thought he was doing his job as a CI when he used fake drugs for

the June 4, 2013, transaction. *See* Tr. at 17:18–22 (Villa). The Court asked Folse what he would tell the jury about these prior transactions. *See* Tr. at 18:14–15 (Court). Folse said that he would tell the jury that: (i) Folse and Fancher were hotly after Burton; (ii) both Folse and Fancher ignored the fact that Burton had previously sold fake drugs but they eventually wanted to catch him with real drugs; and (iii) Fancher never told Folse that he could not use fake drugs or that the drugs had to be real. *See* Tr. at 18:16–19:6 (Villa).

The Court asked the United States whether it would stipulate that it was hotly after Burton. *See* Tr. at 19:9–10 (Court). The United States said that it would. *See* Tr. at 19:12–13 (Hurtado). The Court asked the United States if there were seven incidents before June 4, 2013, in which the FBI used Folse to target Burton. *See* Tr. at 19:14–17 (Court). The United States responded that Folse conducted three to four transactions that targeted Burton and that only Fancher dealt with Folse for those transactions. *See* Tr. at 20:10–18 (Hurtado, Court). The Court asked the United States whether any of the Burton transactions involved fake drugs before June 4, 2013. *See* Tr. at 20:19–21 (Court); *id.* at 21:11–14 (Court). The United States said that Fancher was aware of one transaction that occurred on February 4, 2013, during which Folse made it appear as though he had purchased real drugs, but those drugs turned out to be fake. *See* Tr. at 20:22–21:4 (Hurtado); *id.* at 21:11–14 (Court, Hurtado). The United States asserted that Fancher suspects that Folse pocketed the money that the FBI gave him for the transaction. *See* Tr. at 21:3–4. The Unit-

ed States said that Fancher did not tell Folse not to use fake drugs after that transaction, because the substance that Folse obtained field-tested positive for a controlled substance and because Fancher did not learn the results of a more accurate second test—which indicated that the substance was fake—until March, 2014. *See* Tr. at 22:8–23:6 (Hurtado); *id.* at 24:6–18 (Court, Hurtado). The United States agreed to disclose the FBI reports regarding the February 4, 2013, incident, because it intended to offer them at trial. *See* Tr. at 29:15–21 (Hurtado).

The Court asked whether Fancher suspected, before June 4, 2013, that Folse had either used fake drugs or kept part of the proceeds from the drug transactions which he had set up for the FBI. *See* Tr. at 30:17–19 (Court). The United States said that Fancher did not. *See* Tr. at 30:20 (Hurtado). Folse argued that, during Fancher's interrogation of Folse after the June 4, 2013, incident, Fancher accused him of using fake drugs in transactions with three different people in addition to Burton: Garrett, Dante, and Lencho.[4] *See* Tr. at 31:21–24 (Villa). The Court said—and the United States agreed—that Fancher was bluffing when he made those statements to Folse, and that he did not have any evidence to support those statements. *See* Tr. at 32:6–10 (Court); *id.* at 32:11 (Hurtado). The Court told the United States to review the reports for the transactions that involved Garrett, Dante, and Lencho, and make sure that there is nothing in them that indicates Fancher was suspicious that Folse was selling fake drugs or keeping the drug transactions' proceeds. *See* Tr. at 32:18–25 (Court).

Folse also noted that the FBI's reports for the drug transactions which he con-

---

4. It is unclear whether these names are first names, last names, or nicknames. Neither Folse nor the United States has provided any additional information about these three individuals.

ducted indicate that FBI agents met with him, searched him and his car, and did not find any drugs or money on him both before and after the transactions—indicating that there is no way Folse could think that he would get away with stealing money from the FBI. *See* Tr. at 33:2–9 (Villa). The United States said that it would stipulate that: (i) the FBI's protocol in such situations is to count the money before giving it to the CI and to search the CI before and after the transactions; and (ii) Fancher followed that protocol for every drug transaction that he executed with Folse. .*See* Tr. at 33:18–34:4 (Court, Hurtado). The Court said that, aside from the United States' agreement to disclose the reports for the February 4, 2013, transaction, it would not order the United States to disclose any other reports regarding the drug transactions that Folse executed for the FBI. *See* Tr. at 32:24–25 (Court).

Third, Folse argued that audio recordings, records, or reports regarding Ronquillo's custodial interview are discoverable because Ronquillo's knowledge about what Burton told him before the June 4, 2013, transaction "would obviously go to Mr. Folse's defense." Tr. at 34:18–25 (Villa). The United States responded that Joel Myers, an Assistant United States Attorney for the District of New Mexico, and Fancher both indicated that Ronquillo's interview was not recorded and that the only report in the United States' possession regarding that interview is the 302—which Folse has already received. *See* Tr. at 35:1–6 (Hurtado); *id.* at 35:22–36:12 (Hurtado).

Fourth, Folse explained his request for numerous FBI policies governing CIs and targets. *See* Tr. at 36:18–65:17 (Villa, Court). Folse said that he wants the United States to disclose three categories of FBI policies: (i) the FBI's policies for recording and documenting agents' discus-sions with CIs; (ii) the FBI's policies for recording and documenting agents' discussions with targets; and (iii) the FBI's policies governing CIs generally. *See* Tr. at 40:8–16 (Villa). Addressing Folse's request for the FBI's policies on recording and documenting agents' discussions with CIs, the United States said that, according to Fancher, agents are not required to record their conversations with CIs, but if an agent decides to record such a conversation, the recording must be disclosed. *See* Tr. at 42:16–43:6 (Court, Hurtado). The United States noted, however, that Fancher did not know whether that policy was written down or was an informal policy. *See* Tr. at 43:7–10 (Court, Hurtado). The Court asked whether Folse had any material indicating that the FBI has a policy that required Fancher to record those calls; Folse said that he did not. *See* Tr. at 43:17–23 (Court, Hurtado). Upon the Court's questioning, the United States said that Fancher will have two or three conversations with a CI over a few days and he summarizes those conversations in a written report that he places in the CI's file—in other words, there is some form of written documentation every time an agent has a conversation with a CI. *See* Tr. at 46:19–47:3 (Hurtado). The United States clarified, however, that there is no written FBI policy requiring an agent to keep such records. *See* Tr. at 45:13–15 (Court, Hurtado).

The Court asked the United States whether the FBI has any policies for recording or documenting agents' discussions with targets. *See* Tr. at 49:6–10 (Court). The United States said that the policy is the same as with CIs—it is in the agent's discretion whether to make such recordings and reports. *See* Tr. at 49:17–23 (Court, Hurtado); *id.* at 50:7–10 (Court, Hurtado). The Court asked Folse whether he had any reason to believe that the United States is inaccurately characteriz-

ing the FBI's policies; Folse said that he did not. *See* Tr. at 49:24–50:6 (Court, Hurtado).

The Court asked Folse what general FBI policies regarding CIs he thinks Fancher violated. *See* Tr. at 50:15–20 (Court). Folse explained that he has a 2005 Office of Inspector General Report and the Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources from 2006, which detail the debriefings that the FBI must conduct with CIs, the scope of CIs' work, and how CIs are permitted to negotiate drug transactions. *See* Tr. at 40:18–24 (Villa). Folse argues that these documents indicate that

findings ... have to be made regarding Otherwise Illegal Activity, which shall be documented in Mr. Folse's file; that the illegal activity is necessary for whatever the purpose is, to obtain information, obtain evidence, make arrests, that sort of thing. The findings have to include the risk that the FBI will not be able to closely monitor the confidential human source's participation in the otherwise illegal activity.

The reason that's important is because I assume that the allegation from the Government is they're not actively monitoring the phone calls between Mr. Folse and Mr. Burton. Those are recorded by the prisons. That's prison policy. But this says that they're supposed to document any risk that they can't closely monitor the CI's participation in this activity. So there is that documentation.

"The risk that the FBI will not be able to ensure that the CI does not realize undue profits from his or her participation in Otherwise Illegal Activity." So there is supposed to be a docu-

ment whether there is a risk that the CI can profit, as [Folse] is accused [of doing] in this case.

"If the CI is authorized to engage in illegal activity, at least one FBI agent, along with one additional Government official present as a witness, shall review with that CI written instructions that the CI is authorized only to engage in specific conduct set forth in the written authorization and not any other illegal activity." So that's supposed to be documented. What did they sit down with Mr. Folse and tell him? Who was the other person present for that?

[Did Fancher] obtain[ ] permission from either the parole officer or the prison to use someone who on parole or in prison ... as a CI? The state guidelines, the state probation guidelines are that the person has to have permission from the judge and from ... the director of the prison or the director of probation and parole.

Tr. at 50:22–50:17 (Villa).[5] Upon questioning by the Court, the United States agreed to stipulate that the guidelines that Folse quoted are substantially the same guidelines that the FBI uses today. *See* Tr. at 52:18–23 (Court, Hurtado). With that stipulation, Folse said that he "could live without the guidelines themselves." Tr. at 53:3–4 (Villa).

Finally, Folse asks the Court to compel the United States to produce all recordings and documentation of Fancher's conversations with Folse and Burton. *See* Tr. at 53:3–6 (Villa). The Court asked why the United States would not disclose these recordings and reports. *See* Tr. at 53:13–18 (Court). The United States contended that, under rule 16, it is not required to

---

**5.** Although the Court reporter put quotation marks around multiple paragraphs in this passage—indicating that Villa was quoting

from something when he made those statements—there is no indication in the Tr. what source Villa was quoting.

disclose internal government documents, including investigative reports. *See* Tr. at 53:19–22 (Hurtado). The United States also pointed out that those reports do not contain any Jencks material and, if they did, the United States would disclose them. *See* Tr. at 53:22–53:4 (Hurtado).

Regarding Fancher's conversations with Folse, the United States said that it would allow Folse to review specific information in Folse's CI file: (i) administrative information—such as authorized illegal activity information, and payments that Folse received from and made for the FBI; (ii) everything in Folse's CI file related to the Burton investigation; and (iii) preliminary documents to ensure that Fancher was complying with the FBI's policies for CIs—such as when he first decided to use Folse as a CI, his evaluation of the risk of using Folse as a CI, contacting the state prison for permission to use Folse as a CI, and similar documents. *See* Tr. at 54:18–58:17 (Court, Hurtado, Villa). The United States explained that, within Folse's CI file, the investigative matters for this case may be interspersed with records of the prior drug transactions that Folse set up for the FBI. *See* Tr. at 57:18–24 (Hurtado). The United States wanted to make sure that it could redact those records before allowing Folse to review the file. *See* Tr. at 57:24–58:2 (Hurtado). Folse said that, although he would not waive his previous objection that he is entitled to those records, if the Court's ruling is that he should not receive that information, he has no objection to the redaction itself. *See* Tr. at 58:5–10 (Villa). The Court stated that the United States should try to go light on the redactions and give Folse as much as it can. *See* Tr. at 58:18–21 (Court).

The Court asked Folse why he wanted the FBI's recordings and documentation of Fancher's conversations with Burton. *See* Tr. at 59:8–10 (Court). Folse said that one of the disputes in this case is whether Folse meant fake drugs or real drugs when he used the word "soap" in conversations with Fancher. Tr. at 60:22–61:1 (Villa). Folse contended that, accordingly, he would want to know what sort of language Fancher used in his conversations with Burton—whether he said something like "[y]ou're going to bring me seven racks for this much soap." Tr. at 60:18–22 (Villa). The Court asked the United States whether the general investigative file—which contains all documentation of Folse's conversations with Burton—contains a record of any conversation between Fancher and Burton in which they used the words "soap" for any purpose. Tr. at 61:10–13 (Court); *id.* at 62:6–15 (Court, Hurtado). The United States said that it does not. *See* Tr. at 61:10–13 (Hurtado); *id.* at 62:6–15 (Court, Hurtado). The United States clarified that, although there were telephone calls between Fancher and Burton, there is no documentation of those calls or any other conversation that Fancher had with Burton. *See* Tr. at 63:12–64:5 (Court, Hurtado). The United States said that there was only one recording with the undercover police officer who conducted the drug transaction with Ronquillo on June 4, 2013, but that the officer did not write a report about the incident. *See* Tr. at 64:7–12 (Hurtado). The United States added that, if such a recording exists, the United States will disclose it to Folse. *See* Tr. at 65:4–7 (Hurtado). According to the United States, however, there are no reports detailing undercover officers' or agents' communications with Burton. *See* Tr. at 65:10–17 (Court, Hurtado, Villa).

### LAW REGARDING RULE 16

█ Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

Upon a defendant's request, the government must permit the defendant to in-

spect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

(i) the item is material to preparing the defense;

(ii) the government intends to use the item it its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Fed.R.Crim.P. 16(a)(1)(E). Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition." *United States v. Maranzino*, 860 F.2d 981, 985–86 (10th Cir.1988) (citing *Jencks v. United States*, 353 U.S. 657, 667, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957)). Rule 16 also does not obligate the United States to "take action to discover information which it does not possess." *United States v. Badonie*, No. CR 03–2062 JB, 2005 WL 2312480, at *5–6 (D.N.M. Aug. 29, 2005) (Browning, J.) (quoting *United States v. Tierney*, 947 F.2d 854, 864 (8th Cir.1991))(internal quotation marks omitted). Nor is the United States required to secure information from third parties. *See United States v. Gatto*, 763 F.2d 1040, 1048 (9th Cir.1985) (holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

 Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." *United States v. Graham*, 83 F.3d 1466, 1474 (D.C.Cir.1996) (quoting *United States v. Lloyd*, 992 F.2d 348, 351 (D.C.Cir.1993)) (internal quotation marks

omitted) (citation omitted). "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor." *United States v. Graham*, 83 F.3d at 1474 (citing *United States v. Caicedo–Llanos*, 960 F.2d 158, 164 n. 4 (D.C.Cir. 1992)) (internal quotation marks omitted).

### *LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA*

 The Due Process Clause requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. 1194. The Supreme Court of the United States has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. *See Giglio v. United States*, 405 U.S. at 153, 92 S.Ct. 763; *Douglas v. Workman*, 560 F.3d 1156, 1172–73 (10th Cir.2009) ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985))); *United States v. Abello–Silva*, 948 F.2d 1168, 1179 (10th Cir.1991) ("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined *Brady v. Maryland* and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request,

favorable evidence is material, and constitutional error results from its suppression by the government." *Kyles v. Whitley,* 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. 3375). *See Douglas v. Workman,* 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); *United States v. Summers,* 414 F.3d 1287, 1304 (10th Cir. 2005) ("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

### 1. *Material Exculpatory Evidence Under Brady v. Maryland.*

■ "The Constitution, as interpreted in *Brady,* does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." *Smith v. Sec'y of N.M. Dep't of Corr.,* 50 F.3d 801, 823 (10th Cir.1995). *Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. 1194. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. *See United States v. Allen,* 603 F.3d 1202, 1215 (10th Cir.2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. at 682, 105 S.Ct. 3375 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." *United States v. Fleming,* 19 F.3d 1325, 1331 (10th Cir.1994). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial ... including whether the defendant should testify." *Case v. Hatch,* 731 F.3d 1015 (10th Cir.2013) (quoting *United States v. Burke,* 571 F.3d 1048, 1054 (10th Cir.2009)) (internal quotations omitted).

■ "To be material under *Brady,* undisclosed information or evidence acquired through that information must be admissible." *Banks v. Reynolds,* 54 F.3d 1508, 1521 n. 34 (10th Cir.1995) (quoting *United States v. Kennedy,* 890 F.2d 1056, 1059 (9th Cir.1989)). The Supreme Court, in *Cone v. Bell,* 556 U.S. 449, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009), noted:

Although the Due Process Clause of the Fourteenth Amendment, as interpreted by *Brady,* only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. *See Kyles [v. Whitley],* 514 U.S. at 437, 115 S.Ct. 1555 ("[T]he rule in *Bagley* (and, hence, in *Brady)* requires less of the prosecution than the *ABA Standards for Criminal Justice Prosecution Function and Defense Function* 3–3.11(a) (3d ed.1993)"). *See also ABA Model Rules of Professional Conduct* 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.").

556 U.S. at 470 n. 15, 129 S.Ct. 1769.

■ The United States bears the burden of producing exculpatory materials;

defendants have no obligation to first point out that such materials exist. *See Kyles v. Whitley*, 514 U.S. at 437, 115 S.Ct. 1555 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of reasonable probability is reached") (citations omitted)(internal quotation marks omitted); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir.1973) (granting a mistrial for failure to produce personnel files of government witnesses), *overruled on other grounds by United States v. Henry*, 749 F.2d 203 (5th Cir.1984); *United States v. Padilla*, No. CR 09–3598 JB, 2011 WL 1103876, at *6 (D.N.M. Mar. 14, 2011) (Browning, J.). This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way." *Kyles v. Whitley*, 514 U.S. at 433, 115 S.Ct. 1555 (internal quotation marks omitted). Additionally, "[u]nder *Brady*, the good or bad faith of government agents is irrelevant." *United States v. Quintana*, 673 F.2d 296, 299 (10th Cir.1982). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." *Kyles v. Whitley*, 514 U.S. at 439, 115 S.Ct. 1555.

### 2. *Timing of the Disclosure Under Brady v. Maryland.*

 "The obligation of the prosecution to disclose evidence under *Brady* can vary depending on the phase of the criminal proceedings and the evidence at issue." *United States v. Harmon*, 871 F.Supp.2d 1125, 1149 (D.N.M.2012) (Browning, J.). As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in *Brady v. Maryland*." *United States v. Burke*, 571 F.3d

1048, 1054 (10th Cir.2009). The Tenth Circuit has recognized that "[i]t would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." *United States v. Burke*, 571 F.3d at 1054. "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" *United States v. Burke*, 571 F.3d at 1054. The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with *Brady*, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

*United States v. Burke*, 571 F.3d at 1054. Notably, "not every delay in disclosure of *Brady* material is necessarily prejudicial to the defense." *United States v. Burke*, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." *United States v. Burke*, 571 F.3d at 1056.

 Once a prosecutor's obligations under *Brady v. Maryland* have been triggered, however, they "continue[ ] throughout the judicial process." *Douglas v. Workman*, 560 F.3d at 1173. For instance, the prosecutor's obligation to disclose *Brady v. Maryland* material can arise during trial. *See United States v. Headman*, 594 F.3d 1179, 1183 (10th Cir. 2010) ("Although *Brady* claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such

as impeachment evidence) that is unavailable to the government until trial is underway."). The disclosure obligation continues even while a case is on direct appeal. *See United States v. Headman*, 594 F.3d at 1183; *Smith v. Roberts*, 115 F.3d 818, 819, 820 (10th Cir.1997) (applying *Brady v. Maryland* to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that *Brady v. Maryland* does not require "preguilty plea disclosure of impeachment information." *United States v. Ruiz*, 536 U.S. 622, 629, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002) ("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not."). The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." *United States v. Ruiz*, 536 U.S. at 632, 122 S.Ct. 2450 (emphasis in original). The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." *United States v. Ruiz*, 536 U.S. at 632, 122 S.Ct. 2450. The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

*United States v. Ruiz*, 536 U.S. at 630, 122 S.Ct. 2450. The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." *United States v. Ruiz*, 536 U.S. at 630, 122 S.Ct. 2450. The Tenth Circuit has reiterated these principles from *United States v. Ruiz*:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in *United States v. Ruiz*, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. *Ruiz* emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances—even though the defendant may not know the specific detailed consequences of invoking it."

*United States v. Johnson*, 369 Fed.Appx. 905, 906 (10th Cir.2010) (unpublished) (quoting *United States v. Ruiz*, 536 U.S. at 630, 122 S.Ct. 2450).[6]

---

**6.** *United States v. Johnson* is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. *See* 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for

The Tenth Circuit has held, however, that *United States v. Ruiz* does not apply to exculpatory evidence but rather applies only to impeachment evidence:

> *Ruiz* is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in *Ruiz* that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a *Brady* violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

*United States v. Ohiri*, 133 Fed.Appx. 555, 562 (10th Cir.2005) (unpublished). The Tenth Circuit qualified its holding in *United States v. Ohiri*, however, stating that the case presented "unusual circumstances." 133 Fed.Appx. at 562.

The United States Courts of Appeals "have split on the issue whether *Brady v. Maryland's* restrictions apply to suppres-

sion hearings." *United States v. Harmon*, 871 F.Supp.2d at 1151. In an unpublished opinion, the Tenth Circuit, without discussing whether *Brady v. Maryland* applies to a suppression hearing, rejected a defendant's argument that the prosecution violated *Brady v. Maryland* by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material. *See United States v. Johnson*, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir.1997) (unpublished table decision). Specifically, the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different. First, we question whether the evidence in question would have been admitted at the suppression hearing. Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined. Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a *Brady* violation.

*United States v. Johnson*, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the *Bra-*

---

their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, ... and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

*United States v. Austin*, 426 F.3d 1266 (10th Cir.2005) (citations omitted). The Court finds that *United States v. Johnson, United States v. Ohiri*, 133 Fed.Appx. 555 (10th Cir.2005) (unpublished), and *United States v. Johnson*, 117 F.3d 1429, 1997 WL 381926 (10th Cir.1997) (unpublished table decision), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

*dy* line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" *United States v. Bowie,* 198 F.3d 905, 912 (D.C.Cir.1999) (citation omitted). Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from *United States v. Bowie. See United States v. Bullock,* 130 Fed.Appx. 706, 723 (6th Cir.2005) (unpublished) ("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the *Brady* issues at stake here.").

The United States Court of Appeals for the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held, before the Supreme Court issued its *United States v. Ruiz* decision, that *Brady v. Maryland* applies to suppression hearings. *See United States v. Barton,* 995 F.2d 931, 935 (9th Cir.1993) ("[W]e hold that the due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); *Smith v. Black,* 904 F.2d 950, 965–66 (5th Cir. 1990) ("Timing is critical to proper *Brady* disclosure, and objections may be made under *Brady* to the state's failure to disclose material evidence prior to a suppression hearing."), *vacated on other grounds,* 503 U.S. 930, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992). The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other circuits, it was not "obvious" for clearerror purposes that "*Brady* disclosures are required prior to suppression hearings." *United States v. Stott,* 245 F.3d 890, 902 (7th Cir.2001). The Court has previously observed that, although the United States Courts of Appeals have split on whether *Brady v. Maryland* applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in *United States v. Ruiz* that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea." *United States v. Harmon,* 871 F.Supp.2d at 1151.

### 3. *Evidence Must Be in the United States' Possession.*

 "It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" *United States v. Tierney,* 947 F.2d 854, 864 (8th Cir.1991) (quoting *United States v. Beaver,* 524 F.2d 963, 966 (5th Cir.1975)). *Accord United States v. Kraemer,* 810 F.2d 173, 178 (8th Cir.1987) (explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); *United States v. Badonie,* 2005 WL 2312480, at *3. On the other hand, "a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." *Carey v. Duckworth,* 738 F.2d 875, 878 (7th Cir.1984). Under *Brady v. Maryland,* "[a] prosecutor must disclose information of which it has knowledge and access." *United States v. Padilla,* 2011 WL 1103876, at *7 (citing *United States v. Bryan,* 868 F.2d 1032, 1037 (9th Cir.1989)). "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" *United States v. Padilla,* 2011 WL 1103876, at *7 (quoting *United States v. Brooks,* 966 F.2d 1500, 1503 (D.C.Cir.1992)). A prosecutor

does not have a duty, however, to obtain evidence from third parties. *See United States v. Combs,* 267 F.3d 1167, 1173 (10th Cir.2001) (observing that *Brady v. Maryland* does not oblige the government to obtain evidence from third parties). *See also United States v. Huerta–Rodriguez,* No. CR 09–3206, 2010 WL 3834061 JB, at *4, 10 (D.N.M. Aug. 12, 2010)(Browning, J.)(noting that the United States cannot be compelled to produce the NMSP officers' personnel files, because the NMSP, which was not a party to the case, possessed the files, and the United States was only able to review the files at the NMSP office, and could not remove or photocopy any documents without a subpoena); *United States v. Badonie,* 2005 WL 2312480, at *3 (denying a motion to compel, because the NMSP possessed the documents, and the United States did not possess the documents that a defendant sought to be produced, even though the United States "could get the information [Defendant] Badonie seeks merely by requesting them").

### THE UNITED STATES' DUTY TO DISCLOSE UNDER THE JENCKS ACT

In *Jencks v. United States,* the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." 353 U.S. at 672, 77 S.Ct. 1007. In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges

to deprive the accused of anything which might be material to his defense.

353 U.S. at 671, 77 S.Ct. 1007.

■ Congress codified *Jencks v. United States'* holding in the Jencks Act. *See United States v. Kimoto,* 588 F.3d 464, 475 (7th Cir.2009) (explaining that "the Jencks Act ... was enacted in response to the Supreme Court's holding in *Jencks v. United States*"). The Jencks Act provides:

> **(a)** In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
>
> **(b)** After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a),(b). "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified." *United States v. Lujan,* 530 F.Supp.2d 1224, 1232 (D.N.M. 2008) (Brack, J.) (quoting 18 U.S.C.

§§ 3500(a), (b)). The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment." *Palermo v. United States*, 360 U.S. 343, 349, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment." *United States v. Smaldone*, 544 F.2d 456, 460 (10th Cir. 1976) (citing *Palermo v. United States*, 360 U.S. at 352, 79 S.Ct. 1217).

The Jencks Act defines statements as follows:

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e). The Tenth Circuit has held that interview notes can be statements under the Jencks Act if they are substantially verbatim. *See United States v. Smith*, 984 F.2d 1084, 1086 (10th Cir. 1993). At least one district court within the Tenth circuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act. *United States v. Jackson*, 850 F.Supp. 1481, 1508 (D.Kan.1994) (Crow, J.). In *United States v. Lujan*, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico,

explained that rough interview notes may be discoverable under the Jencks Act, when a defendant makes "at least ... a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F.Supp.2d at 1266. Judge Brack went on to hold that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under the Jencks Act. 530 F.Supp.2d at 1267. *See United States v. Cooper*, 283 F.Supp.2d 1215, 1238 (D.Kan. 2003) (Crow, J.) (noting that rough interview notes may be discoverable under the Jencks Act); *United States v. Jackson*, 850 F.Supp. at 1508–09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy. *See United States v. Smaldone*, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."). To satisfy this burden, the defendant need not prove that particular materials are within the Jencks Act's scope, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." *United States v. Smith*, 984 F.2d at 1086 (quoting *Ogden v. United States*, 303 F.2d 724, 733 (9th Cir.1962)). The defen-

dant's demand for documents under the Jencks Act must·be sufficiently precise for a court to identify the requested statements. *See United States v. Smith,* 984 F.2d at 1086. For example, in *United States v. Smith,* the Tenth Circuit found that a defendant had met his burden and made a prima facie showing that a witness's statement existed which may be producible under the Jencks Act when a government witness testified during the United States' case in chief that a government agent interviewed her before she testified, and the defense counsel moved for production of the notes. *See* 984 F.2d at 1085–86. Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement. *See* 984 F.2d at 1086.

In *United States v. Fred,* No. CR 05–801 JB, the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant. No. CR 05–0801 JB, Order at 1, filed November 8, 2006 (Doc. 86). The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly prepare for·cross-examination of the FBI agent who conducted the interview at trial. *See* No. CR 05–0801 JB, Order at 1–2. The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be turned over to the defendants after the agents testify at trial. See *United States v. Goxcon–Chagal,* No. CR 11–2002 JB, 2012 WL 3249473, at *2, *6 (D.N.M. Aug. 4, 2012) (Browning, J.). Similarly, in *United States v. Tarango,* 760 F.Supp.2d 1163 (D.N.M.2009) (Browning, J.), the Court, applying the Jencks Act,

held that the United States must produce FBI agents' 302s, after the United States' witnesses testified at trial, to the extent that those reports contained statements from witnesses who testified at trial. *See* 760 F.Supp.2d at 1164, 1167.

## ANALYSIS

After securing certain stipulations and concessions from the United States, the Court will deny the Motion. First, the Court will deny Folse's request for all records related to the investigations that the FBI and the NMSP conducted of the shooting that occurred on June 4, 2014. The United States has stipulated that: (i) neither Burton nor Ronquillo knew that they were selling to law enforcement officers on June 4, 2013; and (ii) Fancher has never been criticized, reprimanded, or formally punished for the events that occurred on June 4, 2013. There is no indication that the records which Folse seeks contain any information that is discoverable under rule 16 which supports any facts other than those to which the United States has already stipulated. Second, the Court will deny Folse's request for all records relating to the drug transactions that he conducted before June 4, 2013, as a CI for the FBI. The United States has promised that it will disclose all records relating to the drug transaction that Folse conducted on February 4, 2013, because the United States intends to offer evidence and testimony about that transaction at trial. Moreover, the United States has stipulated that: (i) Fancher did not suspect before June 4, 2013, that Folse had either used fake drugs or kept part of the proceeds from the drug transactions that he had set up for the FBI; (ii) Fancher never had a conversation with Folse in which he told Folse not to use fake drugs; (iii) the FBI's protocol with CIs is to count the money before giving it to the CI, and

to search the CI before and after the transactions; and (iv) Fancher followed that protocol for every drug transaction that he executed with Folse. There is no indication that these records contain any information that is discoverable under rule 16 which would support anything other than that which the United States has already stipulated. Third, the Court will deny Folse's request for any audio recordings, records, or reports regarding Ronquillo's custodial interview. The United States represented at the hearing on the Motion that Ronquillo's interview was not recorded and that the only report in the United States' possession regarding that interview is the 302—which Folse has already received. Fourth, the Court will deny Folse's request for FBI policies governing CIs and agents' conversations with targets. Because the United States has stipulated that the FBI policies that Folse possesses from 2005 are substantially similar to the current policies, the policies that Folse seeks are immaterial his defense and are, therefore, not discoverable under rule 16. Fifth, the Court will deny Folse's request for all audio recordings or documentation of conversations that Fancher had with Folse and Burton. Because the United States has represented that there were no recordings or documentation for Fancher's conversations with Burton, the Court cannot order the United States to disclose information which does not exist. Regarding Fancher's conversations with Folse, the United States said that it would allow Folse to review specific information in Folse's CI file: (i) administrative information—such as authorized illegal activity information and payments that Folse received from and made for the FBI; (ii) everything in Folse's CI file related to the Burton investigation; and (iii) preliminary documents to ensure that Fancher was complying with the FBI's policies for CIs—such as when he first decided to use

Folse as a CI, his evaluation of the risk of using Folse as a CI, contacting the state prison for permission to use Folse as a CI, and similar documents. Aside from this information, Folse has not explained to the Court how any additional information regarding Folse's conversations with Fancher is discoverable under rule 16.

## I. THE COURT WILL DENY FOLSE'S REQUEST FOR ALL RECORDS RELATED TO THE INVESTIGATIONS THAT THE FBI AND THE NMSP CONDUCTED OF THE SHOOTING THAT OCCURRED ON JUNE 4, 2013.

■■■■ The Court will deny Folse's request for all records related to the investigations that the FBI and the NMSP conducted of the shooting that occurred on June 4, 2013. Folse has offered two reasons why these reports are discoverable: (i) they may indicate that neither Ronquillo nor Burton knew that they were selling to law enforcement officers on June 4, 2013, see Tr. at 4:9–15 (Villa); and (ii) they may show that Fancher was criticized, reprimanded, or formally punished for the events that occurred on June 4, 2013—which is information that Folse can use to impeach Fancher and demonstrate that Fancher had a motive to blame Folse for those events, see Tr. at 8:17–25 (Villa). The United States stipulated at the hearing on the Motion that neither Ronquillo nor Burton knew that they were selling to law enforcement officers on June 4, 2013. See Tr. at 5:4–6 (Court); id. at 5:11–15 (Court, Villa); id. at 5:7–8 (Hurtado); id. at 5:16 (Hurtado). The United States also stipulated that the FBI's and the NMSP's reports detailing those agencies' investigations into what occurred on June 4, 2013, does not contain material that the United States must produce under Giglio v. United States—e.g., any evidence that Fancher

was punished, criticized, or violated any FBI guidelines in setting up and executing the drug transaction with Folse. *See* Tr. at 10:4–6 (Court); *id.* at 10:12–14 (Court); *id.* at 10:18–23 (Court); *id.* at 11:6–9 (Court); *id.* at 10:15–17 (Hurtado). The United States has also represented that there were no disciplinary measures taken or adverse findings made against Fancher at any point regarding the events of June 4, 2013. *See* Tr. at 11:1–5 (Hurtado); *id.* at 11:19–25 (Hurtado).

Rule 16(a)(1)(E)(i) provides that the United States must disclose any documents that are "material to preparing the defense." Fed.R.Crim.P. 16(a)(1)(E)(i). Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, ... or assisting impeachment or rebuttal." *United States v. Graham,* 83 F.3d at 1474 (quoting *United States v. Lloyd,* 992 F.2d at 351) (internal quotation marks omitted) (citation omitted). "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor." *United States v. Graham,* 83 F.3d at 1474 (citing *United States v. Caicedo–Llanos,* 960 F.2d at 164 n. 4) (internal quotation marks omitted). Beyond the information to which the United States has already stipulated, Folse has not offered any reason why the reports that he seeks contain any material information that is discoverable under rule 16. Without any indication that delving through these reports would provide Folse with any information that he does not already have, the Court will not allow Folse to engage in a "broad or blind fishing expedition among documents possessed by the Government." *Jencks v. United States,* 353 U.S. at 657, 77 S.Ct. 1007.

The United States has the duty to produce any exculpatory material evidence to Folse and has promised that it will do so. The Court has advised the United States to take a second look at those reports—and to be sure to look at them personally—to determine whether they contain any material that must be disclosed under *Giglio v. United States* and any exculpatory material that must be disclosed under *Brady v. Maryland.* In the end, the burden remains on the United States to know its case and comply scrupulously with those requirements. If it is going to resist production of these reports, it must be certain that they do not contain exculpatory or impeachment material. Beyond these cautions, however, the Court finds no reason to second-guess the United States' judgment. Consequently, the Court will deny Folse's request for all records related to the investigations that the FBI and the NMSP conducted of the shooting that occurred on June 4, 2013.

## II. THE COURT WILL DENY FOLSE'S REQUEST FOR ALL RECORDS RELATING TO THE DRUG TRANSACTIONS THAT HE CONDUCTED BEFORE JUNE 4, 2013, AS A CI FOR THE FBI.

The Court will deny Folse's request for all records relating to the drug transactions that he conducted before June 4, 2013, as a CI for the FBI. Folse argues that these records are discoverable under rule 16, because they would show that: (i) Folse and Fancher were hotly after Burton; (ii) both Folse and Fancher ignored that Burton had previously sold fake drugs, but they eventually wanted to catch him with real drugs; and (iii) Fancher never told Folse that he could not use fake drugs or that the drugs had to be real. *See* Tr. at 18:16–19:6 (Villa). The United States stipulated at the hearing on the Motion that it was "hotly after" Bur-

ton. Tr. at 19:9–10 (Court); *id.* at 19:12–13 (Hurtado). The United States also stipulated that: (i) Fancher did not suspect before June 4, 2013, that Folse had either used fake drugs or kept part of the proceeds from the drug transactions that he had set up for the FBI, *see* Tr. at 30:17–19 (Court); *id.* at 30:20 (Hurtado); and (ii) Fancher never had a conversation with Folse in which he told Folse not to use fake drugs, *see* Tr. at 23:7–12 (Hurtado, Court). Regarding the one transaction that Folse later discovered involved fake drugs—the February 4, 2013, transaction—the United States said that it would disclose the reports for that transaction, because it intended to offer testimony and evidence about the transaction at trial. *See* Tr. at 29:15–21 (Hurtado). The United States also stipulated that: (i) the FBI's protocol with CIs is to count the money before giving it to the CI and to search the CI before and after the transactions; and (ii) Fancher followed that protocol for every drug transaction that he executed with Folse. *See* Tr. at 33:18–34:4 (Court, Hurtado). Folse argues that, during Fancher's interrogation of Folse after the June 4, 2013, incident, Fancher accused him of using fake drugs in transactions with three different people in addition to Burton: Garrett, Dante, and Lencho. *See* Tr. at 31:21–24 (Villa). Again, the United States stipulated that Fancher was bluffing when he made those statements and that he had no evidence to support those statements. *See* Tr. at 32:6–10 (Court); *id.* at 32:11 (Hurtado). Aside from the information to which the United States has already stipulated, Folse has offered no reason why the reports from the other drug transactions that he executed for the FBI contain material evidence.

As with the FBI's and the NMSP's investigations into the June 4, 2013, incident, the United States should personally review all of the reports for the drug transactions that Folse executed for the FBI before June 4, 2013, to determine if they contain any indication that Folse was selling fake drugs, that Folse was keeping the drug transactions' proceeds, or that Fancher was suspicious that Folse was doing either of those things. Without any indication that those reports contain material evidence, the Court will not order the United States to disclose them. The bottom line is that these reports do not appear very important unless they illustrate that Folse previously sold fake drugs for the FBI or the FBI authorized him to do so.

### III. THE COURT WILL DENY FOLSE'S REQUEST FOR ANY AUDIO RECORDINGS, REC-ORDS, OR REPORTS REGARD-ING RONQUILLO'S CUSTODIAL INTERVIEW.

The Court will deny Folse's request for any audio recordings, records, or reports regarding Ronquillo's custodial interview. The United States has stated that Ronquillo's interview was not recorded and that the only report in the United States' possession regarding that interview is the 302—which Folse has already received. *See* Tr. at 35:1–6 (Hurtado); *id.* at 35:22–36:12 (Hurtado). The Court cannot reasonably order the United States to disclose something that it does not have. In light of the fact that the United States has represented that there is no recording of Ronquillo's custodial interview and there is no documentation of the interview aside from the 302 that Folse already has, the Court will deny Folse's request for more information about the interview.

### IV. THE COURT WILL DENY FOLSE'S REQUEST FOR FBI POLICIES GOVERNING CIS AND TARGETS.

The Court will deny Folse's request for numerous FBI policies. Folse

seeks three sets of FBI policies: (i) the FBI's policies for recording and documenting agents' discussions with CIs; (ii) the FBI's policies for recording and documenting agents' discussions with targets; and (iii) the FBI's policies governing CIs generally. *See* Tr. at 40:8–16 (Villa). The United States has represented that agents are not required to record their conversations with CIs, but, if an agent decides to record such a conversation, the recording must be disclosed. *See* Tr. at 42:16–43:6 (Court, Hurtado). The United States stipulates, however, that Fancher did not know whether that policy was written down or was an informal policy. *See* Tr. at 43:7–10 (Court, Hurtado). Regarding written documentation, the United States says that Fancher will have two or three conversations with a CI over a few days and he summarizes those conversations in a written report that he places in the CI's file—in other words, there is some form of written documentation every time an agent has a conversation with a CI. *See* Tr. at 46:19–47:3 (Hurtado). The United States notes, however, that there is no formal policy that requires FBI agents to keep such records. *See* Tr. at 45:13–15 (Court, Hurtado). The Court asked the United States whether the FBI has any policies for recording and documenting agents' discussions with targets. *See* Tr. at 49:6–10 (Court). The United States said that the policy is the same as with CIs—it is in the agent's discretion whether to make such recordings or reports. *See* Tr. at 49:17–23 (Court, Hurtado); *id.* at 50:7–10 (Court, Hurtado). The Court asked Folse whether he had any reason to believe that the United States is inaccurately characterizing the FBI's policies; Folse said that he did not. *See* Tr. at 49:24–50:6 (Court, Hurtado).

The United States has stipulated that Fancher was neither disciplined nor criticized in any way for the events that oc-

curred on June 4, 2013. *See* Tr. at 10:15–17 (Hurtado); *id.* at 11:1–5 (Hurtado); *id.* at 11:19–25 (Hurtado). Regarding the general FBI policies governing CIs, the United States has stipulated that the guidelines that Folse quoted are substantially the same guidelines that the FBI uses today. *See* Tr. at 52:18–23 (Court, Hurtado). The United States also stipulated that it would not argue at trial that these policies do not govern them today. *See* Tr. at 52:18–53:2 (Court, Hurtado). With those stipulations, Folse has conceded that he "could live without the guidelines themselves." Tr. at 53:3–4 (Villa).

Although Folse contends that Fancher may have violated the FBI's recording and reporting policies for CIs and targets, he has offered no evidence to support his contentions. This speculation—mere hopeful wishing—is an insufficient basis for the court to compel discovery in a criminal case. Without a more compelling reason for this information, the Court is reluctant to order the disclosure of internal policies of how the FBI deals with its targets and CIs for the world to see. The Court also notes that, in addition to its obligations under *Brady v. Maryland,* the United States has a preexisting duty to disclose any impeachment evidence—*i.e.,* any evidence indicating that Fancher violated FBI policies by failing to make audio recordings of or sufficiently document his conversations with Folse or Burton. In light of the United States' preexisting obligations and Folse's lack of evidence that Fancher violated FBI policies, the Court will deny Folse's request for FBI policies.

## V. THE COURT WILL DENY FOLSE'S REQUEST FOR ALL RECORDINGS AND DOCUMENTATION OF FANCHER'S CONVERSATIONS WITH FOLSE AND BURTON.

The Court denies Folse's request for all recordings and documentation of

Fancher's conversations with Folse and Burton. Regarding Fancher's conversations with Folse, the United States says that it will allow Folse to review the following information in Folse's CI file: (i) administrative information in the file— such as authorized illegal activity information, payments that Folse made for and received from the FBI; (ii) everything in Folse's CI file related to the Burton investigation; and (iii) preliminary documents to ensure that Fancher was complying with the FBI's policies for CIs—such as, when he first decided to use Folse as a CI, his evaluation of the risk of using Folse, contacting the state prison for permission to use Folse as a CI, and similar documents. *See* Tr. at 54:18–58:17 (Court, Hurtado, Villa). Aside from the disclosures to which the United States has already agreed—which includes everything in Folse's CI file related to the Burton investigation—Folse has not identified any information that is discoverable under rule 16. Consequently, the Court will not order the United States to disclose any additional information regarding Fancher's conversations with Folse beyond what it agreed to disclose at the hearing on the Motion.

■ Regarding recordings and documentation of Fancher's conversations with Burton, the United States stipulates that, although there were telephone calls between Fancher and Burton, there is no recording or documentation of those calls or any other conversation that Fancher had with Burton. *See* Tr. at 63:12–64:5 (Court, Hurtado). The United States said that there was only one recording with the undercover police officer who conducted the drug transaction with Ronquillo on June 4, 2013, but that the officer did not write a report about the incident. *See* Tr. at 64:7–12 (Hurtado). The United States added that, if such a recording exists, the United States will disclose it to Folse. *See* Tr. at 65:4–7 (Hurtado). According to the United States, however, there are no reports detailing undercover officers' or agents' communications with Burton. *See* Tr. at 65:10–17 (Court, Hurtado, Villa). If the United States has that recording but has not disclosed it to Folse, it must do so now. Otherwise, as the Court has previously stated, the Court cannot order the United States to disclose something that it does not have. It may not be sound policy for the FBI to not have any record of its conversations with targets, but given that the United States has represented that it has no such requirement, that Fancher made no such documentation, and that Folse has offered no evidence indicating that the Court should doubt the United States' representations, the Court will deny Folse's request for audio recordings and documentation of Fancher's conversations with Burton.

**IT IS ORDERED** that the Defendant Kevin Folse's Sealed Motion to Compel Production of Discovery, filed November 9, 2014 (Doc. 28), is denied. If the United States has not turned over the information that it promised to disclose to Folse at the December 5, 2014, hearing, it must do so immediately.